454 So.2d 1165 (1984)
STATE of Louisiana
v.
Dedrick BENNETT.
No. KA 83 1447.
Court of Appeal of Louisiana, First Circuit.
July 18, 1984.
Writ Denied November 16, 1984.
*1169 Ossie B. Brown, Dist. Atty., by Joseph Lotwick, Asst. Dist. Atty., Baton Rouge, for plaintiff-appellee.
Kathleen S. Richey, Asst. Public Defender, Baton Rouge, for defendant-appellant.
Before SHORTESS, LANIER and CRAIN, JJ.
LANIER, Judge.
Dedrick Bennett was charged by grand jury indictment with two counts of first degree murder in violation of La.R.S. 14:30. He pled not guilty, was tried by a jury and was found guilty of two counts of second degree murder in violation of La.R.S. 14:30.1. He was sentenced to serve life at hard labor without benefit of probation, parole or suspension of sentence in the custody of the Louisiana Department of Corrections on each count, and the court specified that the sentences were to run consecutively with each other and consecutively to any other sentence that Bennett was then serving.

FACTS
Between 5:15 and 5:30 a.m. on December 12, 1981, an armed robbery was committed at the 7-11 Store located at 5288 Lavey Lane in Baker, Parish of East Baton Rouge, Louisiana. During the course of the armed robbery, Deputy Michael W. Ritchie of the East Baton Rouge Parish Sheriff's Office and Ronald Robique, the store clerk, were killed.

*1170 MOTION TO SUPPRESS CONFESSION

(Assignment of Error 2)
Bennett contends that his confession was not free and voluntary and was the product of fear, duress, intimidation, threats and promises.
Sergeant Bobby Dale Callender of the East Baton Rouge Parish Sheriff's Office testified that he was involved in the investigation of this case from its beginning on December 12, 1981. On May 24, 1982, he secured a warrant for the arrest of Bennett. Bennett was arrested at approximately 1:30 a.m. on May 25, 1982, at a residence in Scotlandville by Officer Steve Doener. Officer Doener was assisted by Officers Jay Thompson, Joey Booth and David Denicola. Bennett was brought to the Scotlandville substation where he was turned over to Callender and Captain Silas Geralds of the East Baton Rouge Parish Sheriff's Office. Callender and Geralds then took Bennett to the courthouse where he was placed in a room in the narcotics office. Callender orally advised Bennett of his rights when he was put in the police unit. Callender also told Bennett he was arrested for armed robbery and murder at the 7-11 on Lavey where Deputy Ritchie and Clerk Robique were killed. Bennett was not questioned in the police unit. After arriving at the courthouse, Callender got a Miranda rights form, filled it out and read it to Bennett. Geralds was a witness to this. Bennett said he understood his rights and signed the form at 2:13 a.m. Bennett did not request to speak with a lawyer and agreed to answer questions. Bennett was not impaired by alcohol, drugs or illness. No promises were made and no force or threats were used. Neither Callender nor Geralds left during the questioning. Callender asked Bennett to tell him about the robbery and Bennett did. Callender asked Bennett if he would give a taped statement and Bennett consented. Callender again read Bennett his rights at the start of the taped statement. After the taped statement was completed, Callender attempted to play it back and discovered that the tape was inaudible. Callender asked Bennett to make a second taped statement and Bennett agreed. Callender again advised Bennett of his Miranda rights at the commencement of the second taped statement. Callender never talked to Bennett again after taking the second taped statement. Lieutenant Cecil Jarreau was present for the second taped statement. All of the answers given by Bennett were freely and voluntarily made. The door to the room where the statements were taken was shut during interrogation. Bennett never refused to answer questions. Bennett did not ask to speak to his mother. Callender opened the door to the room and walked out in the hall of the narcotics office to get a tape recorder but never left the narcotics office. Callender did not discuss other robberies with Bennett. Deputy Ritchie (who was killed in the robbery) was Callender's cousin.
Captain Silas Geralds testified that Bennett was arrested on May 25, 1982, on Morganza Street. He was present when Callender gave Bennett his Miranda rights. Officer Jarreau came in the room for taking the second taped statement. Geralds did not discuss a lawyer with Bennett. No one discussed the death penalty with Bennett in Geralds' presence. There were other deputies in the narcotics office, but they did not come in the room where Bennett was being interrogated. Geralds never left the room during questioning, and no one entered the room during questioning. The only three people who talked to Bennett were Callender, Jarreau and himself.
Dedrick Bennett testified he was arrested on Morganza Avenue by officers in three police vehicles. He was not told what he was arrested for or advised of his rights. Sergeant Callender and another deputy took him to the Scotlandville substation. Callender and Geralds then took him from the substation to the courthouse and put him in a small room with two desks. Bennett heard people talking next door to the room in which he was located. Geralds told him he was charged with armed robbery and two counts of murder. *1171 Bennett asked for a lawyer, and Callender told him he could have one appointed when he went to court in the morning. Bennett asked to speak to his mother before questioning, and Geralds told him he could not because he had already talked to her. Callender and Geralds left the room. While they were gone, two deputies came in the room with Bennett. One had blonde hair, a blonde mustache, glasses, cowboy boots, jeans and was approximately 5'8" tall. The other deputy had on a blue suit. The blonde deputy asked Bennett if he wanted to take a test (apparently a polygraph test). He also talked to Bennett about a robbery of a lady and the murders of two ladies in a laundromat. The deputy in the blue suit had some pictures (apparently artist sketches) which he showed to Bennett. These conversations lasted approximately thirty minutes. Callender and Geralds returned to the room but left again. Another deputy came into the room, put his leg on top of the desk and asked Bennett if he knew about the robbery. This deputy asked Bennett to cooperate. Bennett told him he did not know anything about the robbery, and the deputy then asked him if he would rather burn up in the electric chair. Bennett did not remember what this deputy looked like. This conversation lasted about twenty minutes. Callender and Geralds then came back in the room. Geralds again left, and Callender took Bennett to a room with packages in it. In this second room, Callender told Bennett that it was his cousin who was killed in the robbery (Deputy Ritchie). Callender also told Bennett that if he told the truth he would help him. Callender asked Bennett if he wanted to get burned in the electric chair. Callender then brought Bennett back to the first room. Bennett thought about what everyone told him and decided to give a statement. Bennett kept telling the officers he did not do it, but they said he did. Callender and Geralds started questioning Bennett without advising him of his rights. Bennett did not sign the Advice of Rights form until after he gave his first statement. He did not know what the form was and thought it was a paper saying he was arrested. After the first taped statement, Bennett did not talk to anyone. He asked for a lawyer and to speak to his mother. After the first statement, Bennett was put in a cell. Bennett was taken out of the cell to give the second taped statement. The sun had come up by the time he made the second taped statement. During the course of one of the interrogations, Geralds left the room and went to the other side of the narcotics office where other deputies were located. Subsequently, Geralds and Callender told Bennett that the other deputies were mad because of Deputy Ritchie's death. Also, during one of the interrogations, Geralds told Bennett that he would help him with the grand jury. The deputy in the blue suit was present for the second statement.
Sergeant Callender was recalled for rebuttal testimony. He testified that, during the entire interrogation of Bennett, he never left Bennett except to step into the hall momentarily. No one else was involved in the interrogation process except Geralds, Jarreau and himself. Callender went into the hall for a few minutes to get a tape recorder. It was not possible for someone to go into the room, close the door and interrogate Bennett without him knowing of it. No one else went in. Bennett never asked for a lawyer. Callender explained the Advice of Rights form to Bennett, and Bennett signed it before the interrogation started. The time between going to the narcotics office and starting the first taped statement was less than an hour. Callender did not tell Bennett that he would talk to the grand jury for him. After the first taped statement, Bennett asked Callender and Geralds if they would help, and Callender said "I don't know if we can help you." Callender did not interrogate Bennett by himself in another room.
Lieutenant Cecil Jarreau, Jr. of the East Baton Rouge Parish Sheriff's Office was also called as a rebuttal witness. Jarreau testified that he sat in on taking the second taped statement commencing at 3:30 a.m. on May 25, 1982. The first taped interview had started when he arrived at the narcotics *1172 office. He waited outside the interrogation room while the first statement was being taken. Callender came out of the room and said that the first tape did not come out so good and that he wanted to take a second tape. Jarreau went into the room for the second taped statement. Jarreau had no conversation with Bennett until the second taped statement. Jarreau never saw Bennett until he went in for the second taped statement. Jarreau had on a suit that night but could not recall the color. Jarreau was investigating an armed robbery of a 7-11 on Coursey Boulevard. He talked briefly to Bennett about this robbery after the second taped statement was given. Jarreau showed Bennett a composite sketch of suspects in the Coursey Boulevard robbery after the second taped statement. Jarreau did not talk to Bennett about a double murder at a laundromat. There were five or six deputies in the narcotics office while the statement was being taken in the room. Jarreau did not talk to Bennett about a polygraph test.
After hearing this testimony, the district court denied the motion to suppress the confession without giving reasons.
The State has the burden of proving the admissibility of a confession. La.C. Cr.P. art. 703(D). The State must show that the confession was free and voluntary and not induced by threats, promises or coercion. La.R.S. 15:451; State v. Neslo, 433 So.2d 73 (La.1983). When a confession is taken from a person in custody, the State must also show that the person giving the confession was advised of his constitutional rights and that he made an intelligent waiver of those rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Benoit, 440 So.2d 129 (La. 1983). The State must prove the facts establishing admissibility of a confession beyond a reasonable doubt. State v. Burkhalter, 428 So.2d 449 (La.1983). When a defendant alleges police misconduct in reference to the confession, the State must specifically rebut these allegations. State v. Welch, 448 So.2d 705 (La.App. 1st Cir. 1984); State v. Brooks, 434 So.2d 1171 (La.App. 1st Cir.1983), writ denied, 440 So.2d 727 (La.1983). The factual conclusions of a district court on the admissibility of a confession will not be overturned on appeal unless they are not supported by the evidence. State v. Nathan, 444 So.2d 231 (La.App. 1st Cir.1983), writ denied, 445 So.2d 1232 (La.1984); State v. Wright, 441 So.2d 1301 (La.App. 1st Cir.1983).
There are substantial and serious differences between the version of events given by the police officers and that given by Bennett. The district court judge observed the appearance and demeanor of the parties, and his ruling reflects that he accepted as credible the testimony of the police officers and rejected as unworthy of belief the testimony of Bennett. The version of events given by the police officers shows beyond a reasonable doubt that Bennett was properly advised of his constitutional rights[1], that the confession was given *1173 freely and voluntarily and not induced by threats, promises or coercion, and that the allegations of police misconduct asserted by Bennett did not occur. We have carefully reviewed the record, and the district court ruling not to suppress the confession is supported by the evidence.
This assignment of error is without merit.

CROSS-EXAMINATION ABOUT JUVENILE ARRESTS

(Assignment of Error 1)
Bennett contends that the district court committed error when it overruled his objection to cross-examination by the State pertaining to his juvenile arrests. Bennett contends that evidence of arrest is not proper impeachment under La.R.S. 15:495 (because only evidence of conviction is admissible) and that such questioning violates the privileged status afforded juvenile records by La.C.J.P. art. 122 and La.R.S. 13:1586.
During the State's cross-examination of Bennett at the motion to suppress, the following testimony was taken:
Q. Were you curious about what was on thatwhat that paper was? Did you wonder what that was?
A. Not really. I thought it was probably the paper for me saying that I was being arrested. I wouldn't know. I just, you know, signed it.
Q. Why wouldn't you know?
A. Huh?
Q. Why wouldn't you know?
A. Like I say, I never knew too much about none of this here; what theyI never knew nothing about the system; how theyyou know, I had never been arrested like this here.
Q. You've never been arrested?
A. No. One time on a receiving stolen goods charge; that's all.
Q. That's the only time you ever had any dealings with the police?
A. That's the only time.
Q. Your only experience with the police or the sheriff's office is from this arrest back in May of this year
A. No
Q. and an arrest for receiving stolen things.
A. No, this wasn't the only time. I doneI done been arrested onin my juvenile time.
Q. How many times?
A. About twoabout two or three times, I'd say.
Q. Was it two or three?
MS. FOURNET: Judge, I'll object to any questions about his juvenile record.
MR. LOTWICK: Well, the point is, Judge, is that he's denied ever being arrested, and he says that his ignorance of this whole procedure is due to the fact that he has never had any experience with the police. So any prior dealings that he may have had with the police, whether he's a juvenile or whatever he was, is relevant.
A. I was saying I never
THE COURT: I overrule the objection, Proceed.
A. I never had experience with the deputies down here and dealing with well, as a juvenile. I'm talking about coming up in the age where I was old enough to go to parish prison and like thisI never.
Initially, we note that Bennett was allowed to testify without objection that he had been arrested two or three times as a juvenile. Errors not complained of at the time of occurrence are waived. La.C.Cr.P. art. 841; State v. Thomas, 427 So.2d 428 (La.1983); State v. Gomez, 433 So.2d 230 (La.App. 1st Cir.1983), writs denied, 440 So.2d 730 (La.1983) and 441 So.2d 747 (La. 1983).
*1174 Secondly, the answer to the question which was objected to was not responsive to the question but was a self-serving statement that Bennett was only talking about a time when he was old enough to go to parish prison. This response was not prejudicial and did not furnish the information requested.
Thirdly, Bennett contended he did not understand his rights and gave the confession because he did not understand the "system". Bennett further testified that he had never been arrested "like this here." The obvious implication of this testimony is that, since he had little contact with the system, he did not know how to assert and protect his rights. Since Bennett raised this issue in his testimony, the State had a right to contradict and cross-examine concerning this claim. Although the fact of arrest cannot be used to impeach under La.R.S. 15:495, it can be used if it has relevance that is independent of that statute. State v. Brady, 381 So.2d 819 (La.1980); State v. Robinson, 337 So.2d 1168 (La.1976). The evidence of arrest in the instant case would have independent relevance because it would contradict the claim of Bennett that he was not familiar with the system and was ignorant of his rights and the procedures used by police. Since Bennett opened the evidentiary door, he cannot now complain about the State walking through it.
Finally, even if the ruling were error, it would not necessarily serve as the basis for a reversal of the convictions and sentences. This ruling occurred on a motion to suppress and not before a jury. When an error has occurred in an evidentiary ruling during a hearing on a motion to suppress a confession, the practice of the Louisiana Supreme Court and this Court has been to remand the motion for a reopened hearing on the motion to suppress to correct the error. State v. Jackson, 424 So.2d 997 (La.1982); State v. Edwards, 375 So.2d 1365 (La.1979); State v. Sterling, 444 So.2d 273 (La.App. 1st Cir. 1983). Even if the evidence objected to is not considered, the remaining evidence adduced at the motion to suppress supports the district court's ruling thereon.
This assignment of error is without merit.

CONSTITUTIONALITY OF ACT 495 OF 1983

(Assignment of Error 3)
Bennett contends that the district court committed error by overruling his objection to the court's enforcement of Act 495 of 1983 which reduced the number of peremptory challenges in capital cases from twelve to eight. Bennett contends that the reduction of peremptory challenges deprives him of his right to a full and fair voir dire examination and his right to an impartial jury. He further contends that he cannot successfully pick a fair and impartial jury of twelve when he is only permitted eight peremptory challenges.
There is no federal constitutional right to peremptory challenges. U.S. Const. amend. VI; Stilson v. United States, 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154 (1919). Article I, Section 17 of the Louisiana Constitution of 1974 provides, in pertinent part, as follows: "The accused shall have the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. The number of challenges shall be fixed by law." Thus, although the Louisiana Constitution grants to a criminal defendant a right to challenge jurors peremptorily, it does not give him a right to a specified number of challenges the discretion to fix the number has been given to the legislative branch of State government. The legislature's authority to fix the number of peremptory challenges has been exercised in La.C.Cr.P. art. 799. Prior to Act 495 of 1983, Article 799 provided for twelve peremptory challenges for a defendant in trials of offenses punishable by death or necessarily by imprisonment at hard labor. Act 495 reduced that number to eight. This reduction is within the authority granted by the Louisiana Constitution to the legislature. The case of Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. *1175 824, 13 L.Ed.2d 759 (1965) cited by the defendant is not determinative. Swain dealt with the use of peremptory challenges by the State to systematically exclude blacks from trial juries over a period of time.
In the alternative, Bennett contends that if Act 495 of 1983 is per se constitutional, it would be unconstitutional to apply the amendment to him (ex post facto) because the offense with which he is charged is alleged to have occurred prior to the effective date of the amendment.
Bennett is charged herein with committing offenses on December 12, 1981. The effective date of Act 495 of 1983 was August 30, 1983. La. Const. of 1974, art. III, § 19. The trial in this case commenced on September 12, 1983.
Both the Federal and State Constitutions prohibit the enactment of ex post facto laws. U.S. Const. art. I, § 10; La. Const. of 1974, art. I, § 23. In State v. Sepulvado, 342 So.2d 630, 635 (La.1977), an ex post facto law is defined as follows:
An ex post facto law, by definition, is one which is passed after the occurrence of a fact or commission of an act, which retrospectively changes the legal consequences or relations of such fact or deed. Black's Law Dictionary 662 (Rev. 4th ed. 1968). See also La.Civil Code art. 8.
Certain criteria for determining if a law is ex post facto have been established. The ex post facto prohibition comes into effect when a law makes an act criminal which was innocent when done and punishes such action; or aggravates a crime or makes it greater than when committed; or changes the punishment and inflicts a greater punishment than the law in effect when the crime was committed; or alters the rules of evidence to receive less or different testimony that the law required at the time the offense was committed in order to convict. Calder v. Bull, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798). A fifth category holds that any law is considered ex post facto which is enacted after the offense was committed and which alters the situation of the accused to his disadvantage. Kring v. Missouri, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1882); ...
The problem involved in deciding whether a procedural law is ex post facto was broadly stated by Mr. Justice Stone in Beazell v. Ohio, 269 U.S. 167, 171, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925):
"Just what alterations of procedure will be held to be of sufficient moment to transgress the constitutional prohibition cannot be embraced within a formula or stated in a general proposition. The distinction is one of degree. But the constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation ... and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance".
As the issue is viewed in the context of this case the Court must decide whether the statute materially impairs the right of the accused to have the question of his guilt determined according to the law as it was when the offense was committed. At the same time, it must be recognized that the accused is not entitled of right to be tried in the exact mode, in all respects, that may be prescribed for the trial of criminal cases at the time of the commission of the offense for which he is charged.
(Underscoring added).
In Sepulvado, the defendant allegedly committed two first degree murders on June 27, 1975. At the time of the commission of these offenses, Article 493 of the Code of Criminal Procedure prohibited charging more than one offense in a single indictment. Article 493 was amended by Act 528 of 1975 to allow the charging of two or more offenses in the same indictment or information. This Act became effective on September 12, 1975. The defendant was then charged in a single indictment for both murders on September 25, 1975. The Louisiana Supreme Court ruled that Act 528 was not an ex post facto law.
*1176 In Richey v. Hunter, 407 So.2d 427 (La. App. 1st Cir.1981), it was held that a rule passed by the Board of Pardons which enabled it to use its discretionary power to deny a pardon without a hearing was not ex post facto. In State v. Metoyer, 427 So.2d 93 (La.App. 3rd Cir.1983), it was held that Act 143 of 1982 which amended La.C. Cr.P. art. 914 to reduce the time for taking an appeal in a criminal case from fifteen to five days was not ex post facto. The Court in Metoyer observed that the amendment to Article 914 did not deprive the defendant of his constitutional right to an appeal and was a procedural change which did not affect the defendant's substantive rights. In State v. Ferrie, 243 La. 416, 144 So.2d 380 (1962), the defendant was charged with indecent behavior with juveniles, the offense occurring on March 26, 1960. At the time of the commission of the offense, the prescriptive period was one year after the offense was made known. By Act 25 of 1960, effective July 27, 1960, the prescriptive period was increased to two years. The defendant was then charged by a bill of information on December 15, 1961, more than one year after the offense was made known but less than two years after the offense was committed. In determining that Act 25 was not an ex post facto law, the Court made the following observations:
No substantial right of the accused is affected by such a change, nor has the situation been changed to the disadvantage of the accused, for the time during which he may be prosecuted, not having run, deals only with the procedure attached to his conviction or acquittal. The penalty of the offense has not been changed to the disadvantage of the accused, the rules of evidence have not been amended, nor has the definition of the crime affecting the facts been altered in any way. What has been altered is a procedural right, and no undue disadvantage to the accused results therefrom for he has acquired no advantage until the period of limitation has run.

Ferrie, 144 So.2d at 384.
Although a criminal defendant has a constitutional right to challenge peremptorily, his right to a specific number of challenges is statutory. The reduction of the statutory number of peremptory challenges does not affect the nature of the crime, the authorized punishment or evidentiary rules. The statutory right to a specific number of peremptory challenges relates to the mode (procedure) utilized to determine guilt. As such, the applicability of Act 495 is determined by the time when the trial commences and not the time when the offense was committed. Since the trial in the instant case commenced after the effective date of Act 495, its application is not ex post facto.
This assignment of error is without merit.

COMPOSITION AND IMPARTIALITY OF THE JURY

(Assignments of Error 4, 7, 8, 9 and 10)
In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court ruled that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. However, the Court found no constitutional bar to excluding jurors who stated in advance of trial that they could not even consider returning a verdict of death or that their attitude about the death penalty would prevent them from making an impartial decision as to defendant's guilt. La.C.Cr.P. art. 798 was amended to reflect this ruling.
Prior to trial, Bennett requested that the district court order separate juries to hear the guilt and penalty phases of his bifurcated trial for first degree murder. Bennett argued that a prospective juror's opinion about the death penalty was irrelevant to determine whether he was guilty or innocent and that to exclude veniremen who were subject to a challenge for cause under Article 798 deprived him of a fair cross-section of the community on his jury *1177 and resulted in a conviction-prone jury on the guilt phase of the trial. Bennett presented evidence in the form of national and local studies which purported to support these contentions. Bennett submitted that the Witherspoon rule should be inapplicable to the jury picked to hear the guilt phase but would be applicable to the jury picked for the penalty phase. Finally, he contends that only by granting his motion for the two juries could he receive "the fair and impartial jury he is constitutionally entitled to under the Sixth and Fourteenth Amendments."
Article I, Section 17 of the Louisiana Constitution of 1974 provides that a capital case shall be tried before one jury with the following language: "A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict." (Emphasis added). This language is repeated in La.C.Cr.P. art. 782(A). Pursuant to the above constitutional mandate, La.C. Cr.P. art. 905.1(A) provides that the sentencing hearing in a case where a verdict of guilty has been returned for a capital offense "shall be conducted before the same jury that determined the issue of guilt." In the instant case, such a hearing was not necessary because the defendant was found guilty of a lesser, included, noncapital offense.
The Louisiana Supreme Court has held that mere contentions that veniremen were excluded for cause on Witherspoon grounds, unsupported by evidence, were not sufficient to show a violation of the constitutional right to be tried before a jury composed of a fair cross-section of the community or produce a more guilt-prone jury than one drawn from the general venire. State v. Perry, 420 So.2d 139 (La. 1982); State v. Penns, 407 So.2d 678 (La. 1981). Even with the evidence presented, Bennett cannot prevail. In Smith v. Balkcom, 660 F.2d 573, 576-579 (5th Cir.1981), modified, 671 F.2d 858 (5th Cir.1982), cert. denied, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982), the Court disposed of the "guilt prone" argument as follows:
Smith contends that the exclusion for cause of these veniremen violated his right under the sixth and fourteenth amendments to an impartial jury. He asserts an argument considered but rejected by the Supreme Court in Witherspoonnamely that those veniremen who remain on the jury after the exclusion of those unalterably opposed to the death penalty are more conviction prone than the ones excluded under the `death qualifying' procedure. While Smith does not challenge the exclusion of these unalterably death-opposed veniremen from the panel that determines the penalty to be imposed, he asserts that their being excluded from the guilt determination stage results in the creation of an unconstitutionally conviction-biased jury. In support of his conviction, Smith offers a plethora of studies, some of which were before the Court in Witherspoon.

In rejecting this constitutional objection in Witherspoon, the Supreme Court stated:
The data adduced by the petitioner... are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a per se constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was.
391 U.S. at 517-18, 88 S.Ct. at 1774-75 (footnote omitted). However, the Court did not foreclose a defendant, having more persuasive evidence of juror tendencies, from asserting the guilt proneness of death-qualified jurors in a subsequent case. Some of the issues that would then arise were suggested.

*1178 Even so, a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to guilt. If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment.

Id. at 520 n. 18, 88 S.Ct. at 1776. Seizing this invitation, Smith argues that the studies he has offered provide the requisite degree of proof.
We assume without deciding that Smith's evidence does indeed supply the persuasiveness found lacking by the Supreme Court and by many other courts, both federal and state, since Witherspoon. Nevertheless, for reasons to be discussed, we hold that the exclusion for cause from Smith's jury of veniremen so unequivocally opposed to the death penalty that they would not follow the law on the subject did not deny his constitutional right to an impartial jury.
In Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978), this court rejected the precise contention now urged by Smith. Today we reaffirm the rationale set forth in Spinkellink.

That a death-qualified jury is more likely to convict than a nondeath-qualified jury does not demonstrate which jury is impartial. It indicates only that a death-qualified jury might favor the prosecution and that a nondeath-qualified jury might favor the defendant.

Id. at 594.
All veniremen are potentially biased. The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case. Clearly, the extremes must be eliminatedi.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence. The guarantee of impartiality cannot mean that the state has a right to present its case to the jury most likely to return a verdict of guilt, nor can it mean that the accused has a right to present his case to the jury most likely to acquit. But the converse is also true. The guarantee cannot mean that the state must present its case to the jury least likely to convict or impose the death penalty, nor that the defense must present its case to the jury least likely to find him innocent or vote for life imprisonment. Yet Smith here urges that he has a constitutional right to a jury more likely than a death-qualified jury to find him innocent.
In essence, Smith urges us to define "impartial" as a middle ground that involves a jury with persons who are in effect defendant prone. The logical converse of the proposition that death-qualified jurors are conviction prone is that nondeath-qualified jurors are acquittal prone, not that they are neutral. Smith offers no proof that inclusion of veniremen currently excludable under Witherspoon will not tip the balance in the guilt/innocence determination in favor of the accused. The state as well as the accused enjoys a right to an impartial jury. See Hayes v. Missouri, 120 U.S. 68, 70-71, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887); Williams v. Wainwright, 427 F.2d 921, 923 (5th Cir.1970), modified, 408 U.S. 941, 92 S.Ct. 2864, 33 L.Ed.2d 765 (1972). Such a tilt of the scales of justice would violate that right. As recognized in Spinkellink, the danger of a defendant prone jury is too great to accede to Smith's claim.
The State has decided that the parties' right under the Sixth and Fourteenth Amendments to an impartial jury and the state's interest in the just and evenhanded application of its laws, including [the state's] death penalty, are too fundamental to risk a defendant-prone jury from the inclusion of such *1179 veniremen. The Constitution does not prohibit this judgment.
578 F.2d at 596.
(Footnotes Omitted).
In that same case, the Court rejected the concept of separate juries for the guilt and penalty phases of a capital case and disposed of the "fair cross-section" argument with the following language:
For these reasons, we hold that unalterable opposition to the death penalty is a legitimate disqualification and that the exclusion of such disqualified jurors does not violate the fair cross-section principle of the sixth amendment. The fair cross-section must, in the end, be fair. Neither the state nor the defendant is entitled to an unfair juror whose interests, biases or prejudices will determine his or her resolution of the issues regardless of the law and regardless of the facts. A cross-section of the fair and impartial is more desirable than a fair cross-section of the prejudiced and biased. Smith v. Balkcom, 660 F.2d at 583.[2]
In addition to the above arguments, Bennett contends that the responses given by prospective jurors, Louis E. Hicks, Gloria D. Kaglear, Sharon P. Johnson and Clifford W. Sanford, did not demonstrate that they were unalterably opposed to the death penalty and that the district court committed error when it granted the State's Witherspoon challenges for cause. A review of the voir dire examinations of these jurors indicates that the district court's rulings on the challenges were correct. Furthermore, Bennett did not receive the death sentence, and the Louisiana Supreme Court has consistently held that a defendant who does not receive the death penalty has no valid Witherspoon complaint. State v. Edwards, 406 So.2d 1331 (La.1981).
These assignments of error are without merit.

SYSTEMATIC EXCLUSION OF MINORITIES

(Assignments of Error 5, 6 & 12)
During the voir dire examination, forty-one prospective jurors were examined. The State exercised six of its eight peremptory challenges. Four were used to exclude black persons, one was used to exclude an oriental person and one was used to exclude a white person. The State also successfully exercised three Witherspoon challenges against black persons. The final jury selected, including one alternate, was all white. Ritchie and Robique were white and the defendant is black. In view of this, the defendant contends that the district court committed error when it denied his motions for mistrial and to quash the jury venire due to the systematic exclusion of minorities by the prosecution.
In State v. Williams, 442 So.2d 740, 744 (La.App. 1st Cir.1983), appears the following:
In State v. Brown, 371 So.2d 751 (La. 1979), the Louisiana Supreme Court stated that a defendant is not denied equal protection when the state uses peremptory challenges to exclude blacks unless there is a systematic exclusion over a period of time. State v. Bias, 354 So.2d 1330 (La.1978). The burden is on the defendant to establish a prima facie showing of such exclusion. The motive for the exercise of a peremptory challenge ordinarily is not subject to judicial review, at least in the absence of evidence of systematic exclusion of black jurors from the justice system over a period of time. State v. Haynes, 339 So.2d 328 (La.1976).
A showing by a defendant that peremptory challenges are used to exclude members of a minority in a particular case is not sufficient to establish a violation of the Fourteenth Amendment's equal protection clause. Swain v. Alabama, 380 U.S. at 224, 85 S.Ct. at 838, 13 L.Ed.2d at 774; *1180 State v. Hayes, 414 So.2d 717 (La.1982). In the instant case, Bennett has not shown that the prosecutor, Joseph Lotwick, has exercised peremptory challenges systematically in the past to exclude minorities or that he did so in the instant case in accordance with a long-standing policy of the District Attorney's Office of the Nineteenth Judicial District. State v. Edwards, 406 So.2d 1331 (La.1981). In the absence of such showings, Bennett has failed to meet the burden of proof imposed upon him. State v. Williams, 445 So.2d 1171 (La.1984).
These assignments of error are without merit.

CHANGE OF VENUE

(Assignment of Error 11)
Bennett contends that the district court committed error when it denied his motion for a change of venue. In particular, Bennett contends that the substantial pretrial publicity concerning the facts of the case, the deaths of a young deputy (with a wife and children) and a young cashier, made it impossible to obtain a fair trial in East Baton Rouge Parish.
Bennett presented evidence of the pretrial publicity pertaining to this case showing seven television reports, six radio reports (including a thirty minute program by the father of Ronald Robique about armed robberies of convenience stores) and eight newspaper articles. This publicity primarily occurred at the times of the incident (December 12, 1981), the arrest (May 25, 1982), the grand jury indictment (July 14, 1982) and the arraignment (August 2, 1982). The trial of this matter did not commence until September 12, 1983. The media reports were straightforward stories about the incident and the particular stage of the proceedings being reported. Also filed in evidence is a newspaper account of the arrest of John Earl Square for twenty-one armed robberies on July 16, 1982.
Forty-one persons were examined on voir dire before a jury of twelve and an alternate were chosen. The State was successful in five challenges for cause (four were Witherspoon challenges). The defendant was successful in six challenges for cause. Four of these six challenges for cause were because the prospective juror had a fixed opinion concerning the guilt of the defendant because of pretrial publicity. The State exercised six peremptory challenges, and the defendant exercised nine.[3] Two prospective jurors were granted medical excuses. Of the forty-one persons examined, twenty-nine had some prior knowledge of the facts of the case. However, most of those who admitted prior knowledge had only vague recollections of the facts.
Louisiana Code of Criminal Procedure, Article 622 provides as follows:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
The burden is upon the defendant to prove that there exists such a prejudice in the collective minds of the people of the community that a fair and impartial trial is impossible. State v. Brogdon, 426 So.2d 158 (La.1983). Relevant factors to consider in determining whether to change venue are the nature of the pretrial publicity and the particular degree to which it has circulated in the community, the connection of government officials with the release of the publicity, the length of time between the dissemination of the publicity and the trial, the severity and notoriety of the offense, *1181 the area from which the jury is to be drawn, other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant and any factor likely to affect the candor and veracity of the prospective jurors on voir dire. Although the trial court possesses a broad range of discretion in this area, we are required to make an independent evaluation of the facts to determine whether the accused received a fair trial unfettered by outside influences. State v. Willie, 410 So.2d 1019 (La.1982). A defendant is constitutionally entitled to a panel of impartial jurors. If a defendant can demonstrate that actual prejudice, influence or other reasons exist which will affect the answers of the jurors on the voir dire examination or the testimony of the witnesses at trial, the court must take this into consideration in deciding whether to grant a change of venue. Extensive knowledge in the community of either the crime or the putative criminal is not in itself sufficient to render a trial constitutionally unfair. However, unfairness of a constitutional magnitude may be presumed so as to require a change of venue if the trial atmosphere has been utterly corrupted by press coverage. State v. Kahey, 436 So.2d 475 (La.1983).
The evidence of record fails to show that there was either actual or presumed prejudice against the defendant to a degree that would render a fair trial impossible. The evidence also fails to show that actual prejudice, influence or other reasons existed in the community which would affect the jurors' answers on voir dire. State v. Morris, 429 So.2d 111 (La.1983). The media coverage of the alleged crime was not particularly extensive or inflammatory. See, for example, State v. Goodson, 412 So.2d 1077 (La.1982).
This assignment of error is without merit.

REPETITIVE PROSECUTORIAL QUESTIONING

(Assignments of Error 13 and 14)
Bennett contends that the district court committed reversible error when it overruled defense objections about the prosecution's repetitive questioning of Jim L. Churchman, a forensic scientist from the Louisiana State Police Crime Laboratory. In particular, Bennett contends that the repeated questioning of Churchman as to the identity and location of particular bullets removed from Deputy Ritchie unduly prejudiced him in front of the jury and was unnecessary because a previous prosecution witness had already testified on the same subject matter.
During the prosecution's direct examination of Churchman, the following exchanges occurred:
Q. Now, you attended the autopsy of Mr. Ritchie
A. Yes, sir.
Q. and again, if you would, which bullet that was removed from Mr. Ritchie was the jacketedthe single jacketed bulletthe lone jacketed bullet.
A. I'd have to doublecheck. Imy notesone set of notes shows that it was the bullet labeled bullet number one.
MS. FOURNET: Your Honor, I'm going to object to this. We're going over the same areas again. We've already covered this area with Mr. Churchman. Iit'sit's repetitive, and that's my objection.
MR. LOTWICK: Well, I think it's fairly important, Judge, even ifeven if it's repetitive. It's not my intention to be repetitive but if it'sif it is somewhat repetitive, I think it'sit may be worth repeating.
THE COURT: Overruled. Proceed.
A. Bullet number one, as I've said, right side post lateral neck, is the jacketed bullet.
BY MR. LOTWICK:
Q. Okay, and the entrance wound for thatmade by that bullet was where?
A. Was from the left sideleft side of thethe lower head areaneck.
Q. Did you view the entrance wound pertaining to that bullet

*1182 A. Yes, sir.
Q. and the surrounding area on Mr. Ritchie's body?
A. Yes, sir, I did.
Q. Was there anything else that you observed about it besides the wound itself?
A. Yes, sir, there was the presence of a particular type of gunshot residue referred to as stippling or tattooing.
Q. Okay, and stippling or tattooing is isindicates what?
MS. FOURNET: Your Honor, I'm going to object to this. Again this is an area that Dr. Landry has already covered.
MR. LOTWICK: Well
MS. FOURNET: We're going over and over again the same ground.
THE COURT: Overruled. Proceed.
BY MR. LOTWICK:
Q. Go ahead. The stippling or tattooing that you referred to indicates what?
A. When a firearm is discharged, not all of the gun powder is consumed in this explosion. Part of it flies out of the barrel behind the bullet and when when in very closein very close distances when you have skin involved, these unburned gun power [sic] particles fly and actually imbed themself into the skin; hence the term tattooing or stippling, and that'sthat is the condition that was observed.
A district court judge has much discretion to control the examination of witnesses. La.R.S. 15:275. A conviction will not be reversed due to the district court's control of the witness examination unless an abuse of discretion is shown which affects the substantial rights of the accused. La.C.Cr.P. art. 921; State v. Chapman, 410 So.2d 689 (La.1981).
The first question objected to concerned a restatement of the identification number of the "lone jacketed bullet". Although the defendant claims prejudice, he does not say why or how repeating this information constitutes prejudice. The second question objected to concerned the stippling around the entrance wound. This testimony was objected to because it had already been covered by another witness. Defendant has cited no authority to us, nor are we aware of any, for the proposition that when two or more witnesses observe something of evidentiary value that only one of the witnesses may testify concerning it. Such evidence is admissible although it may be cumulative. In addition, with reference to both objections, the record does not reflect that the district court judge abused the much discretion accorded him by law.
These assignments of error are without merit.

GRUESOME PHOTOGRAPHS

(Assignments of Error 16, 17, 18 and 19)
Bennett contends that the district court committed error when it overruled his objections to nine photographs depicting the crime scene and Deputy Ritchie as he was found dead at that scene. The defendant argues that the photographs are unduly gruesome and unnecessarily cumulative.
The admission of gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the photographs outweighs their probative value. Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted are generally admissible. State v. Kirkpatrick, 443 So.2d 546 (La.1983). Post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing the cause of death and to provide positive identification of the victim. Brogdon, 426 So.2d at 169.
After examining the contested photographs, we find that their probative value clearly outweighs any prejudicial effect and that these photographs were admissible. State v. Craddock, 435 So.2d 1110 (La.App. 1st Cir.1983).
*1183 These assignments of error are without merit.

SUFFICIENCY OF EVIDENCE

(Assignment of Error 27)
Bennett contends that the evidence presented by the State during the trial is insufficient to support verdicts of guilty of second degree murder because there is absolutely no evidence, direct or circumstantial, that proves beyond a reasonable doubt that Bennett had the specific intent to kill either Deputy Ritchie or Ronald Robique.
In State v. Mathews, 375 So.2d 1165 (La. 1979), a majority of the Louisiana Supreme Court determined that the United States Supreme Court case of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) required that the standard of review when considering the sufficiency of the evidence to support a criminal conviction is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This standard for the appellate review of facts in criminal cases has been made statutory. La.C.Cr.P. art. 821; State v. Captville, 448 So.2d 676 (La.1984); State v. Korman, 439 So.2d 1099 (La.App. 1st Cir.1983).
A plea of not guilty places upon the State the burden of proving beyond a reasonable doubt each element of the crime with which the defendant is charged. La. R.S. 15:271; La.C.Cr.P. art. 804(A)(1); State v. Humphrey, 412 So.2d 507 (La. 1981); State v. Gomez, 433 So.2d 230 (La. App. 1st Cir.1983), writs denied, 440 So.2d 730 (La.1983) and 441 So.2d 747 (La.1983). The crime of second degree murder is defined in La.R.S. 14:30.1 for purposes of these proceedings, in pertinent part, as follows:
Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration ... of ... armed robbery,... even though he has no intent to kill or to inflict great bodily harm.
The evidence presented by the State shows that Michael Ritchie and Ronald Robique were shot to death on December 12, 1981, at the 7-11 Store located at 5288 Lavey Lane in Baker, Parish of East Baton Rouge, Louisiana. There were no eyewitnesses to these crimes, and the sole evidence connecting Bennett with the crime is his taped confession.
In his confession, Bennett indicated that prior to 5:00 a.m. on December 12, 1981, he and Shug Bell were drinking in the vicinity of some apartments in Scotlandville. Bell told Bennett "about it" and asked Bennett to "go" with him. Bennett told Bell he didn't know and that he wanted to think about it. Subsequently, Bennett and Bell went to the store in an automobile. The vehicle was parked on the side of the store. Bell walked in the store first and Bennett followed him. Bell approached the cashier's stand and asked the clerk about a street and then pulled a gun. Bell told the clerk to give him the money out of the cash register, and the clerk complied. Bell and Bennett then waited for additional money to come out of some undescribed type of device in the store. Bennett saw the deputy drive up and park by the gas pump in front of the store. Bennett said "police" and started walking out of the store. As Bennett was walking out of the store, he saw Bell going around an aisle toward the back of the store. As Bennett walked out of the door, the deputy caught the door and entered the store. Bennett ran approximately fifty to one hundred feet from the store and hid in some bushes. Bennett heard a lot of shots. After the shooting stopped, Bell came out of the store and started calling Bennett's name. Bell got in the car, picked up Bennett and they drove away. Bell told Bennett he had to shoot "them" and did so with his gun and the deputy's gun. Bell still had the deputy's gun and showed it to Bennett. Bennett described the gun as a .357 or a .44. Bell *1184 told Bennett he would get rid of the guns. Bennett saw Bell three or four days later, and Bell said that the pistols were gone that he got rid of them (but did not say how). Bell got forty or fifty dollars from the robbery and split it with Bennett.
Viewing this evidence in the light most favorable to the prosecution reveals that Bell and Bennett discussed the robbery in Scotlandville and subsequently drove to the store to accomplish it. Bennett followed Bell into the store, and while Bell was robbing the clerk, Bennett stood by the books in the store. When Bennett saw the deputy drive up, he said "police" (apparently to warn Bell) and started walking out of the store. These actions by Bennett also apparently gave Bell sufficient time to successfully ambush the deputy. Although Bennett left the store, he did not leave its vicinity and subsequently drove away from the scene with Bell. Bennett and Bell split the money obtained in the robbery. This is more than sufficient evidence to support a jury factual determination that Bennett was guilty as a principal to the armed robbery by Bell. See, for example, State v. Hayes, 414 So.2d 717 (La.1982).
Although second degree murder may be committed when the offender has a specific intent to kill [La.R.S. 14:30.1(1)], it may also be committed when the offender is engaged in the perpetration of armed robbery, even though he has no intent to kill or to inflict great bodily harm [La.R.S. 14:30.1(2)]. Thus, the evidence shows that Ritchie and Robique were killed during the course of an armed robbery, and Bennett is guilty of second degree murder even though he may not have had an intent to kill or inflict great bodily harm. Because Bennett was a principal (La.R.S. 14:24) and a coconspirator (La.R.S. 15:455) with Bell in the commission of the armed robbery, he was responsible for Bell's acts of killing Ritchie and Robique during the perpetration of the robbery and is guilty of the second degree murders of those men.
This assignment of error is without merit.

FAILURE TO GIVE REQUESTED SPECIAL JURY CHARGES

(Assignment of Error 20)
Bennett contends the district court erred in refusing to give the following requested special charges to the jury:
1.
Ladies and gentlemen, all types of first-degree murder require the element of specific intent. In the case of a first-degree murder conviction, the requisite mental state is that the defendant had the specific intent to kill; it is not enough to find merely that his accomplice had the necessary mental state, since this intent cannot be inferred to the accused. It must be shown that this accused also had the specific intent to kill. State v. Holmes, 388 So.2d 722, 726 (La.1980).
3.
A trial jury's inference that an accused aided and abetted in a crime cannot be mere speculation based upon guilty by association. State v. Schwander, 345 So.2d 1173, 1175 (La.1977).
4.
Ladies and gentlemen, La.R.S. 14:25 defines an accessory after the fact as follows:
An accessory after the fact is any person, who, after the commission of a felony, shall harbor, conceal, or aid the offender, knowing or having reasonable ground to believe that he has committed the felony and with the intent that he may avoid or escape from arrest, trial, conviction, or punishment.
An accessory after the fact may be tried and punished, notwithstanding the fact that the principal felon may not have been arrested, tried, convicted, or amenable to justice.
Accessory after the fact to murder is not responsive to the charge of first-degree murder. Therefore, if you find that at most defendant's conduct amounted to accessory after the fact to first-degree murder, second degree murder, or manslaughter, you must vote not guilty.
*1185 The district court judge gave the following reasons for refusing to give these requested special charges:
THE COURT: All right, after considering the defendant's written requests for special charges, the Court will decline to include the requested charges for the following reasons. First, with respect to numbers one and two, the requested charges are substantially included in the general charges which I have previously provided counsel in this case. However, due to the lack of any objection by the State to the amended version of defendant's request number two, the Court will include that in the charges that it gives. With respect to number three, the State's case does notis not totally devoid of evidence necessary to prove the crime or any essential element of it, and with respect to number four the Court is of the opinion that the charge would not be pertinent to the case, and its inclusion would require qualification, limitation and/or explanation to avoid confusion in the minds of the jury.
It is the duty of the trial judge to give a requested charge which does not require qualification, limitation or explanation and is not included in the general charge or in another special charge to be given, if it is wholly correct and pertinent to the case. La.C.Cr.P. art. 807; State v. Shilling, 440 So.2d 110 (La.1983).
Concerning special charge 1, the trial judge instructed the jury as follows:
The first degree murder statute with which this defendant is charged requires specific intent on part of this defendant, and I will momentarily read to you the definition of specific criminal intent but back on the subject of principals, our law recognizes that one, who by act tending to facilitate the execution of the crime, acted with the knowledge and intent to aid his accomplice in his unlawful design, is also a principal in the eyes of the law and is equally guilty along with the actual perpetrator of the offense.
To constitute the defendant as a principal, you must find that he actually assisted, encouraged, aided and/or abetted his accomplice in the perpetration of the crime. Proof of one person's intent is not proof of another person's intent. Thus, it is necessary as to the accomplice who did not pull the trigger, that the circumstances indicate that he also actively desired the death or great bodily harm of the victim.
Defendant's requested special charge 1 was substantially included in the charge given by the judge. Requested charges which are already substantially given and covered by the general charge are properly refused. State v. Holmes, 388 So.2d 722 (La.1980).
Defendant argues that his requested special charge 3 was appropriate, necessary and should have been given by the trial court because the State had the burden of proving that defendant aided and abetted in the crime beyond a reasonable doubt and that evidence less than that may not be more than guilt by association. This charge is a poor combination of the law on reasonable doubt and principals.
In all cases, the court must charge the jury on the presumption of innocence and reasonable doubt, whether requested to do so or not. La.C.Cr.P. art. 804; Gomez, 433 So.2d at 241. However, La.C. Cr.P. art. 804(A) provides, in pertinent part, as follows:
The court may, but is not required to, define "the presumption of innocence" or "reasonable doubt" or give any other or further charge upon the same than that contained in this article. (Emphasis added).
A review of the record reveals that the trial court adequately charged the jury in accordance with La.C.Cr.P. art. 804(A). Therefore, it was within the trial court's discretion to refuse to further charge the jury on reasonable doubt. The district court had an adequate instruction on principals in its general charge.
For requested special charge 4, defendant argues that the law on accessory after the fact (La.R.S. 14:25) was necessary to *1186 cover every phase of the case, pursuant to State v. Marse, 365 So.2d 1319 (La.1978).
La.C.Cr.P. art. 803 requires that the judge charge the jury as to any responsive verdicts which may be rendered to the indictment or charge. La.C.Cr.P. art. 814 lists the responsive verdicts to a first degree murder indictment as: "Guilty. Guilty of second degree murder. Guilty of manslaughter. Not guilty." Instructions on these permissible verdicts are mandatory. State v. Toomer, 395 So.2d 1320 (La. 1981). The trial judge adequately instructed the jury regarding the elements of the charged offense and the lesser and included offenses (second degree murder and manslaughter). The jury was told that the failure of the State to prove each and every element of the charged offense, or the lesser offenses, must result in a verdict of not guilty. These charges given by the court were complete and accurate. State v. Tompkins, 403 So.2d 644 (La.1981).
Furthermore, a requested charge must be supported by the evidence, for the trial court is not required to instruct the jury on abstract principles of law. Toomer, 395 So.2d at 1335; State v. Clement, 368 So.2d 1037 (La.1979). The evidence introduced shows that Bennett was a principal and not an accessory after the fact. The trial court did not err in refusing to include defendant's requested special charge 4 in its charges to the jury. La.C.Cr.P. art. 807; State v. Anderson, 390 So.2d 878 (La.1980).
This assignment of error is without merit.

JURY CHARGE AND CLOSING ARGUMENT ON LAW OF COCONSPIRATORS

(Assignments of Error 21, 25 and 26)
By request of the State, and over the objection of the defendant, the district court gave the following special charge to the jury on the law of coconspirators:
Each co-conspirator is deemed to assent to or to commend whatever is done in furtherance of the common enterprise, and it is therefore of no moment that such act was done out of the presence of the conspirators sought to be bound thereby or whether the conspirator doing such act be or be not on trial with this co-defendant but in order for these provisions relating to conspiracy to have any affect at all, the State must establish a prima facie case of the existence of a conspiracy to you.
Bennett contends that this charge is a misstatement of the law because it encouraged the jury to apply the law of conspiracy to the charges of first degree murder. This contention is without merit because the charge is taken almost verbatim from La. R.S. 15:455.[4] Where the law applicable to conspiracy is pertinent to a case, the district court judge is required to charge the jury on that concept. La.C.Cr.P. art. 802(1); State v. Brown, 398 So.2d 1381 (La.1981); State v. Clark, 387 So.2d 1124 (La.1980); State v. Sheppard, 350 So.2d 615 (La.1977).
Alternatively, Bennett contends that even if a prima facie case for conspiracy to commit armed robbery was shown, the special charge was improper because no prima facie case of conspiracy to commit murder was shown and Bennett was on trial for murder, not armed robbery. As indicated previously herein, second degree murder may be committed when a human being is killed when the offender is engaged in the perpetration of an armed robbery even though he has no intent to kill or inflict great bodily harm. The perpetration of an armed robbery is essential to prove *1187 second degree murder under this felony-murder doctrine. Thus, the conspiracy to commit the armed robbery is pertinent and relevant to the case.
During his closing argument, the prosecutor made the following observations:
Now, the Court will tell you that you need not find, and I told you at the outset that I don't contend that this man killed anybody, that this man fired any shots at anybody. You don't have to find that, and I don't contend that. You don't have to find that to find him guilty of first degree murder because first degree murder is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm upon more than one person or upon a peace officer or when he's engaged in the perpetration or attempted perpetration of an armed robbery, which is what they were doing, and the circumstances are clear that these two men prepared themselves when they went to that place for anything including any interruption in their plan, including an intrusion by a witness, including even the arrival of the police, and they were prepared for that event, and they carried out their plan to the completion. They completed the robbery; they made their getaway; they split the money; they got rid of the pistols, and their common plan continued up until that point, and their common plan includes on the part of both of them everything that either one of them did in furtherance of their plan which includes the killings by Shug Bell of Mike Ritchie and Ronnie Robique. (Emphasis added).
At this point, counsel for the defendant asked that the jury be retired and objected to this argument by the State and asked for a mistrial or, in the alternative, an admonition to the jury. The district court judge denied both requests. Bennett contends that the district court committed error because the prosecutor's argument was deliberately misleading, inaccurate and an incorrect statement of law.
The crime of conspiracy is committed when an agreement to commit a crime is reached between two or more persons and an act is done in furtherance of the agreement. State v. Richards, 426 So.2d 1314 (La.1982). When a prima facie case of conspiracy has been established, the State is entitled to the evidentiary rule of La.R.S. 15:455 that each coconspirator is deemed to assent to or to commend whatever is done in furtherance of the common enterprise. A prima facie case of conspiracy is presented when the State introduces evidence which, if unrebutted, would be sufficient to establish the fact of conspiracy. State v. Johnson, 438 So.2d 1091 (La.1983).
The evidence (presented by way of Bennett's confession) establishes a prima facie case of conspiracy to commit armed robbery between Bennett and Bell. They discussed the crime at the apartments in Scotlandville; they drove to the store; they entered the store; Bell pulled the gun on the store clerk while Bennett stood by the bookcase; Bell got the money from the clerk; and Bennett warned Bell about the "police". The killings were in furtherance of the common enterprise because they facilitated the escape and eliminated witnesses. Because Bell and Bennett were coconspirators, Bennett is responsible for the acts of Bell, as well as his own. Because these killings occurred during the perpetration of an armed robbery, second degree murders were committed.
The State has the right to make a closing argument about its conclusions of fact and the law applicable to the case. La.C.Cr.P. art. 774. Taken in context, the argument by the State was proper, and the ruling of the district court was correct.
These assignments of error are without merit.

DECREE
For the foregoing reasons, the convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] Bennett was advised of his rights pursuant to an Advice of Rights form which provided, in pertinent part, as follows:

YOUR RIGHTS
We want to question you about an Armed Robbery & Murder that occurred in E.B.R. Parish at the 7-11 Store on Lavey Lane, Dec. 12, 1981. __________________________________
But before we ask you any questions we want you to understand your rights.
You have the right to remain silent or to answer questions.
We inform you that anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before you answer any questions, if you so desire, and you may have the lawyer with you during questioning.
If you want a lawyer but cannot afford one, a lawyer will be provided for you.
If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time in order to get the advice of a lawyer or for any other reason you might have.
______________________________________________ ______________________________________________
CONSENT TO QUESTIONING
I have read the statement of my rights shown above. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me, and no pressure of any kind has been used against me.
[2] In State v. James, 431 So.2d 399, 402 (La. 1983), the Louisiana Supreme Court indicated that the "death qualified" jury issue resulting from Witherspoon challenges "remains susceptible to argument based on new data in this court". The Court did not refer to Smith v. Balkcom which appears to us to be dispositive of the issue.
[3] The defendant's ninth peremptory challenge was taken during the course of picking an alternate juror. See La.C.Cr.P. art. 789.
[4] La.R.S. 15:455 provides as follows:

Each coconspirator is deemed to assent to or to commend whatever is said or done in furtherance of the common enterprise, and it is therefore of no moment that such act was done or such declaration was made out of the presence of the conspirator sought to be bound thereby, or whether the conspirator doing such act or making such declaration be or be not on trial with his codefendant. But to have this effect a prima facie case of conspiracy must have been established.