477 So.2d 759 (1985)
STATE of Louisiana
v.
Shug Levi BELL.
No. 84 KA 1544.
Court of Appeal of Louisiana, First Circuit.
October 8, 1985.
*762 Hon. Ossie Brown, Dist. Atty., by Joe Lotwick, Asst. Dist. Atty., Baton Rouge, for plaintiff-appellee.
Robert J. Roux, Public Defenders' Office, Baton Rouge, for defendant-appellant.
Before LOTTINGER, COLE and CRAIN, JJ.
CRAIN, Judge.
Shug Bell was indicted by the East Baton Rouge Parish Grand Jury with two counts of first degree murder. La.R.S. 14:30. He was tried by a jury, which convicted him as charged. After deliberation of the penalty the jury recommended a life sentence on each count. Defendant was sentenced to serve two consecutive terms of life imprisonment at hard labor, without the benefit of probation, parole or suspension of sentence.[1]
Defendant has appealed, urging fifty-three assignments of error and briefing twenty-one assignments in seven arguments. Assignments of error not briefed are considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.

FACTS
Defendant was charged with the deaths of Deputy Michael W. Ritchie of the East Baton Rouge Parish Sheriff's office and Ronald Roubique, an employee of the 7-11 store where the killings occurred.[2] On the morning of December 12, 1981, Roubique was the sole attendant of the convenience store, located in Baker, Louisiana. Between 5:15 and 5:30 a.m., Roubique was robbed and shot and the deputy, a customer of the store, was shot while standing at the counter. The deputy, shot four times in the neck and head, died instantly. Roubique was alive but unconscious when the shootings were discovered. He was taken to a local hospital, where he died December 20, 1981.
The shootings were discovered around 5:30 a.m. when another customer arrived at the store and, upon glancing inside the glass doors, saw a uniformed officer prone on the floor in a pool of blood. The customer immediately summoned the Baker police, who arrived on the scene within a few minutes of the report. After entering the store, investigators noticed that the cash register was open and devoid of all bills; however, a creased $20.00 bill lay on the register above the drawer. The deputy's car was parked at the gasoline pumps, and a cup of coffee, still warm, was on the counter. Inside Ritchie's badge case the investigators found other bills folded in a manner similar to the $20.00 bill. Although the deputy was wearing his service holster, his firearm had been removed. It was later determined that Ritchie had been shot with two different weapons, three times with one gun and once with a weapon of the same caliber and with the same type of ammunition as carried by members of the East Baton Rouge Sheriff's Department. Roubique was shot with the police-type weapon. Although neither gun has ever been located, the evidence indicates this second weapon is the missing service gun carried by Deputy Ritchie.
*763 Investigators found a six-pack of warm beer at the feet of the slain deputy, and another package of the same brand askew on the beer display at the rear of the store. Latent fingerprints were removed from the beer cans. Although other surfaces were dusted for fingerprints, no other prints were obtainable.
In May, 1982, the East Baton Rouge Parish Sheriff's office received information connecting defendant with this crime. He was subsequently arrested in Dallas, Texas, at which time he gave a statement denying that he had ever been to the store in Baker. Fingerprint examiners positively identified defendant's fingerprints as those removed from the beer cans in the store. Defendant was thereafter indicted for the murder of the two men.

JURY COMPOSITION
In assignments of error four, eleven, seventeen, nineteen, and twenty-five, defendant urges that the trial court erred in granting the state's challenges for cause of five prospective jurors. In assignments of error twenty-six and twenty-eight, defendant urges that the peremptory challenges exercised by the state showed a systematic exclusion of blacks in violation of his right to an impartial and representative jury.

a) CHALLENGES FOR CAUSE
Defendant objects to the exclusion for cause of jurors who testified they would not consider imposing the death penalty. Defendant argues that these jurors were improperly excluded from determining his guilt or innocence, leaving jurors who were more prone to favor the prosecution. The basic argument is that a "death qualified" jury favors the prosecution.
In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court held that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its imposition. However, the court found no constitutional bar to excluding jurors who stated in advance of trial that they could not even consider returning a verdict of death or that their attitude about the death penalty would prevent them from making an impartial decision as to defendant's guilt. La.C.Cr.P. art. 798[3] was amended to reflect this ruling.
Defendant's claim that a jury composed of persons who would consider this imposition of the death penalty results in a jury biased in favor of the prosecution in determining guilt or innocence has previously been considered and rejected by this court in State v. Bennett, 454 So.2d 1165 (La. App. 1st Cir.1984), writ denied, 460 So.2d 604 (La.1984). Therein, we found the case of Smith v. Balkcom, 660 F.2d 573 (5th Cir.1981), modified, 671 F.2d 858 (5th Cir. 1982), cert. denied, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982), to be dispositive of this issue. The Fifth Circuit did not reach the issue of whether defendant had in fact proved that a "death qualified" jury is guilt prone. They simply held that even if they were to assume that a death qualified jury tends to be more guilt prone than a non death qualified jury, the exclusion of potential jurors for cause because they are so unequivocally opposed to the death penalty that they would be unable to follow the law is not a denial of a defendant's constitutional right to an impartial jury. It *764 was stated that "[t]he process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case." Smith v. Balkcom, 660 F.2d at 578. Impartiality of a jury requires the exclusion of those veniremen who, despite the evidence, would automatically vote to acquit, convict, or impose the death sentence or life imprisonment.
The guarantee of impartiality cannot mean that the state has a right to present its case to the jury most likely to return a verdict of guilt, nor can it mean that the accused has a right to present its case to the jury most likely to acquit. But the converse is also true. The guarantee cannot mean that the state must present its case to the jury least likely to convict or impose the death penalty nor that the defense must present its case to the jury least likely to find him innocent or vote for life imprisonment.
Smith v. Balkcom, 660 F.2d at 579.
Defendant cites Grigsby v. Mabry, 569 F.Supp. 1273 (E.D.Ark.1983), affirmed, 758 F.2d 226 (8th Cir.1985) in support of his argument. Although we are mindful that the court therein found merit to defendant's claim and reversed his conviction on the basis that the jury was not impartial, we find the better view to be that of Smith v. Balkcom, which was followed by the Fifth Circuit in Mattheson v. King, 751 F.2d 1432 (5th Cir.1985), and, Sonnier v. Maggio, 720 F.2d 401 (5th Cir.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984).
Other than the Grigsby court, Federal courts which have considered the issue have approved the holding of Smith. See, e.g., Keeten v. Garrison, 742 F.2d 129 (4th Cir.1984). Further, the United States Supreme Court, in Wainwright v. Witt, ___ U.S. ___, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), noted that a jury comprised of persons who are unable to follow the state's laws with regard to the imposition of the death penalty may not be appropriate. The court noted as follows:

Witherspoon is not grounded in the Eighth Amendment's prohibition against cruel and unusual punishment, but in the Sixth Amendment. Here, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts. That is what an "impartial" jury consists of, and we do not think, simply because a defendant is being tried for a capital crime, that he is entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor.

105 S.Ct. at 852.[4] [Emphasis added.]
We find, therefore, that the unlimited use of challenges for cause of jurors who cannot or refuse to apply the Louisiana capital punishment scheme does not result in an unconstitutionally partial jury.
Defendant further argues that his Sixth Amendment right to a fair and impartial jury can be satisfied only by the use of two juries: the first jury, which would determine his guilt or innocence, to be comprised of any person who could make that determination fairly, whether able to impose the death penalty or not; the second jury, which would impose the penalty if the first jury convicted him, to be comprised only of those persons who could impose the death penalty on an accused convicted of first-degree murder. This argument is based on the alleged necessity of a jury comprised in part of jurors who would not impose death in order to be impartial. Having found no merit to defendant's claim of impartiality, we reject his premise that a two-jury system is necessary.

*765 b) SYSTEMATIC EXCLUSION OF BLACKS
Defendant further argues that the state's challenges for cause, coupled with four peremptory challenges exercised by the state, showed a systematic exclusion of blacks which denied him an impartial and representative jury.
During the voir dire examination, forty-five prospective jurors were examined. The state exercised five of its peremptory challenges, four to exclude blacks and one to exclude a white. The state also successfully challenged ten veniremen for cause, seven on the basis of their capital punishment beliefs, two who testified they could not sit in judgment in any criminal case, and one who was acquainted with defendant's counsel. Of the jurors excluded for their beliefs on capital punishment, five were black, one was white, and the race of the seventh prospective juror was not determined for the record.
The final jury selected, including one alternate, was all white. Ritchie and Roubique were white and defendant is black. In view of this fact, defendant contends that the trial court erred when it denied his motion to quash the jury venire due to the systematic exclusion of blacks by the state.
"A defendant is not denied equal protection when the state uses peremptory challenges to exclude blacks unless there is a systematic exclusion over a period of time." State v. Brown, 371 So.2d 751, 753 (La.1979). The burden is on the defendant to establish a prima facie showing of such exclusion. "[T]he motive for the exercise of a peremptory challenge ordinarily is not subject to judicial review, at least in the absence of evidence of systematic exclusion of black jurors from the justice system over a period of time." State v. Haynes, 339 So.2d 328, 330 (La.1976) (footnotes omitted).
A showing by the defendant that peremptory challenges are used to exclude members of a minority in a particular case is not sufficient to establish a violation of the Fourteenth Amendment's equal protection clause. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); State v. Hayes, 414 So.2d 717 (La.1982).
In the instant case, defendant has not shown that the prosecutor has exercised peremptory challenges systematically in the past to exclude minorities or that he did so in the instant case in accordance with a long-standing policy of the District Attorney's office of the Nineteenth Judicial District. State v. Edwards, 406 So.2d 1331 (La.1981), cert. denied, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). In the absence of such showings, defendant has failed to meet his burden of proof. See State v. Williams, 445 So.2d 1171 (La. 1984).

RESTRICTION OF VOIR DIRE
In assignments of error nine and fourteen, defendant argues that the trial court erred when it sustained the state's objections to questions propounded by him during the voir dire examination. He alleges that, because of these rulings, his right to determine whether the jurors could be fair and impartial was curtailed.
An accused in a criminal case is constitutionally entitled to a full and complete voir dire examination and to the exercise of peremptory challenges. La. Const. art. I, section 17. La.C.Cr.P. art. 786 provides that the court, the state, and the defendant shall have the right to examine prospective jurors.
The purpose of voir dire examination is to determine the qualifications of prospective jurors "by testing their competency and impartiality and discovering bases for [the] intelligent exercise of cause and peremptory challenges." State v. Burton, 464 So.2d 421, 425 (La.App. 1st Cir. 1985), writ denied, 468 So.2d 570 (La.1985). "The scope of [the] voir dire examination is within the sound discretion of the trial judge, whose rulings will not be disturbed on appeal in [the] absence of a clear abuse of discretion." State v. Burton, 464 So.2d at 425.
*766 Defendant should be able to make such inquiries of prospective jurors as will enable him to secure his constitutional rights by eliciting facts which show grounds for challenges. State v. Duplessis, 457 So.2d 604 (La.1984). His "right to intelligently exercise cause and peremptory challenges may not be curtailed by the exclusion of non-repetitious voir dire questions which reasonably explore the juror's potential prejudices, predispositions or misunderstandings relevant to the central issues of the particular case." State v. Duplessis, 457 So.2d at 606. However, voir dire examination may not encompass unlimited inquiry into all possible prejudices of prospective jurors, nor their opinions on the evidence (or its weight) to be offered at trial, nor hypothetical questions and questions of law which call for any prejudgment of supposed facts. State v. James, 431 So.2d 399 (La.1983), cert. denied, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983).
During defendant's voir dire examination of Terri Atkinson, the following colloquy occurred:
Mr. Eames: Okay. Let's say that the state was trying to show you that, hey, this guy is a principal and hehe maybe didn't do what is charged here, but some guy who acted with him and with whom he acted did that, and since they acted together or in concert, conspiracy, then he is just as guilty as him. Okay? And what I'm saying is when you come to apply the theory or the principal statute or theory that he just mentioned, would you also require him to show an agreement or combination?
Mr. Lotwick: Judge, I'm going to object to that. I don't think there's any requirement
THE COURT: Sustained.
Mr. Lotwick: that the state has to show an agreement or combination. Thank you.
Defendant argues that his question contained an accurate statement of the applicable law and he should not have been precluded from questioning the prospective juror on her willingness to accept it.
The trial court properly sustained the state's objection. The definition of "principal" is contained in La.R.S. 14:24, which provides as follows:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
The question submitted by defendant was not directed to the determination of the juror's ability to follow the law applicable to the case herein and was properly excluded.
Defendant also alleges that his voir dire examination of Cheryl Lacroix was abridged. He alleges that the court erroneously sustained the state's objection to his discussion of the jurisprudence concerned with the law applicable to principals and accessories.[5]
The record clearly reflects that the state did not object to a question propounded by defendant, but to an open-ended statement of rulings of law. In the discussion that followed, the state reiterated its position that defendant was entitled to question the *767 prospective juror about any part of the law, but that no question had been asked. The court sustained the objection, instructing defendant that his voir dire could not serve to pry into a prospective juror's opinion concerning evidence that might be offered at trial by means of hypothetical questions or questions which might call for pre-judgment of any supposed set of facts.
We find no error in the court's ruling sustaining the state's objections. Defendant was not entitled to engage the prospective juror in a general discussion of the law as it might be interpreted to be applicable in any given set of facts. A prospective juror is not trained in the law and could not be supposed to understand jurisprudential distinctions in an abstract context. The state's objection was properly sustained because defendant's statement, as phrased, was irrelevant.

GRUESOME PHOTOGRAPHS
In assignment of error forty-one, defendant argues that the trial court erred in overruling his objection to the admission of six photographs depicting the crime scene as investigated by the police. He argues that the photographs are gruesome, and that any probative value was outweighed by their prejudicial effect.
[The] admission of gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the photographs outweighs their probative value. Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted are generally admissible.
State v. Kirkpatrick, 443 So.2d 546, 554-555 (La.1983), cert. denied, ___ U.S. ___, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984) (citations omitted).
"Post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing the cause of death and to provide positive identification of the victim." State v. Bennett, 454 So.2d at 1182.
The photographs in question depict the body of Deputy Ritchie on the floor with the beer cans at his feet and the area behind the register where Ronald Roubique was shot. In both areas a substantial quantity of blood is visible. Defendant particularly objected to one photograph which shows the area behind the register because a ten to twenty foot trail of blood is visible, which resulted from the removal of Roubique to the hospital. He alleges this photograph is particularly prejudicial because it does not actually depict the crime scene as it was discovered by the police.
The trial court found the photographs relevant and admissible. With particular reference to the photograph of the register area, the court found it relevant to show the location of the victim at the time he was found. We find the probative value of these photographs outweighs any prejudicial effect and that they were properly admitted.

CLOSING ARGUMENT
In assignment of error fifty-one, defendant alleges that the trial court erred in overruling his objection to improper and inflammatory closing argument by the state. In assignment of error fifty-two, he alleges that the trial court erred in denying his motion for a mistrial based on the same grounds.
During the state's closing argument, the following statement was made to the jury: "No verdict in this case can restore the loss that those two families have suffered, bring back their sons, lessen their sorrows." Defendant argues that this address improperly appealed to prejudice.
"The scope of the closing argument is limited to the evidence admitted, the lack of evidence, conclusions of fact drawn therefrom, and the law applicable to the case." State v. Savoie, 448 So.2d 129, 135 (La.App. 1st Cir.1984), writ denied, 449 So.2d 1345 (La.1984). Appeals to prejudice are specifically prohibited. La.C.Cr.P. art. 774. "If oral argument goes beyond these limits, it may fall within the ambit of La.C. *768 Cr.P. arts. 770 and 771. When such remarks are made in the presence of the jury, either a mistrial or an admonition may be proper." State v. Savoie, 448 So.2d at 135. However, before a verdict will be overturned on the basis of improper argument, the court must be thoroughly convinced that the comment influenced the jury and contributed to the verdict. State v. Savoie, 448 So.2d at 135. In determining whether improper argument has contributed to the verdict, a reviewing court should give credit to the good sense and fairmindedness of the jurors who have heard the evidence. State v. Jarman, 445 So.2d 1184 (La.1984).
Defendant submits, and we agree, that the case herein was charged with emotion. We are not convinced, however, that this fleeting reference to the families of the victims contributed to the verdict. The court instructed the jurors that they were to decide the facts based on the testimony and other evidence and were not to be influenced by sympathy, passion, prejudice or public opinion. The jury was also instructed that the opening statements and closing remarks of the attorneys were not to be considered evidence. Accordingly, defendant's arguments that the court improperly overruled both his objection and motion for a mistrial lack merit.

CHANGE OF VENUE
In assignment of error twenty-seven, defendant argues that the trial court erred by denying his motion for a change of venue. He argues that the case generated extensive pre-trial publicity, lasting in excess of five months, due to the severity of the offense and the particular facts that the victims were a young deputy sheriff, with a wife and small children, and a young cashier. This publicity, he claims, made it impossible to obtain a fair trial in East Baton Rouge Parish.
In support of his motion, defendant incorporated the record put forth by Dedrick Bennett, who had been previously tried and convicted of second-degree murder for this offense. The evidence adduced therein, as previously reviewed by this court, consisted of the following:
... seven television reports, six radio reports (including a thirty minute program by the father of Ronald Roubique about armed robberies of convenience stores) and eight newspaper articles. This publicity primarily occurred at the times of the incident (December 12, 1981), the arrest (May 25, 1982), the grand jury indictment (July 14, 1982) and the arraignment (August 2, 1982) ... The media reports were straightforward stories about the incident and the particular stage of the proceedings being reported.
State v. Bennett, 454 So.2d at 1180.
Forty-five persons were examined on voir dire. Of those, five prospective jurors recalled specific details of the offensetwo worked in the area, the brother of one of the veniremen worked for 7-11, and one was a school teacher, who remembered having taught defendant and Bennett. Seventeen prospective jurors had vague recollections of the offense through news accounts. The knowledge of this group was sketchy, at best. One woman testified that, although she knew something unusual had happened at the store, she was not aware of the type of crime that had occurred. Only one juror had recent knowledge of the offense, a prospective juror who heard a sketchy reference to the charges while awaiting voir dire. This prospective juror, successfully challenged by the state on other grounds, testified that he had walked away as soon as he realized what incident the conversation referred to and knew no other details. Nine prospective jurors stated that they had no knowledge of the offense at all. Of the jurors selected, seven had no previous knowledge of the offense, and six (including the alternate) had vague recollections.
La.C.Cr.P. art. 622 provides for a change of venue, as follows:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that *769 for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
"The burden is upon the defendant to prove that there exists such a prejudice in the collective minds of the people of the community that a fair and impartial trial is impossible." State v. Brogdon, 426 So.2d 158, 165 (La.1983). Relevant factors to consider in determining whether to change venue are the nature of the pretrial publicity and the particular degree to which it had circulated in the community, the connection of government officials with the release of the publicity, the length of time between the dissemination of the publicity and the trial, the severity and notoriety of the offense, the area from which the jury is to be drawn, other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant and any factor likely to affect the candor and veracity of the prospective jurors on voir dire. "Although the trial court possesses a broad range of discretion in this area, we are required to make an independent evaluation of the facts to determine whether the accused received a fair trial unfettered by outside influences." State v. Willie, 410 So.2d 1019, 1024 (La.1982), cert. denied, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984).
If the defendant can demonstrate that actual prejudice, influence, or other reasons exist which will affect the answers of the jurors on the voir dire examination or the testimony of the witnesses at trial, the court must take this into consideration in deciding whether to grant a change of venue ... Extensive knowledge in the community of either the crimes or the putative criminal ... is not in itself sufficient to render a trial constitutionally unfair, unfairness of a constitutional magnitude may be presumed so as to require a change of venue "if the trial atmosphere" has been "utterly corrupted by press coverage."
State v. Kahey, 436 So.2d 475, 482 (La. 1983).
We did not find the information presented by defendant compelling in State v. Bennett, and we do not find a change of venue warranted here. The media coverage of the offense was neither extensive, nor inflammatory. Further, defendant's trial took place more than a year after that of his accomplice, and two years after his arrest. The evidence presented does not show actual or presumed prejudice against defendant of such degree as to render a fair trial impossible, nor to prejudice, influence or affect the answers of prospective jurors on voir dire. The record contains no basis for the inference that the prospective jurors perjured themselves in responding to questions designed to ascertain whether they were aware of the facts of this crime, or their ability to judge defendant on the evidence presented at trial. This assignment of error has no merit.

DENIAL OF RIGHT OF CONFRONTATION
Defendant alleges that his rights to confront his accusers and present a defense were abridged by various rulings of the trial court. In assignment of error thirty-two, defendant alleges that the trial court erred in denying his motion for a continuance[6] in order to obtain expert witnesses in the field of ballistics and fingerprint *770 evidence. In assignments of error thirty-eight and forty, defendant alleges that the trial court erred in denying his pre-trial motions for the appointment of experts or the appropriation of funds for the use thereof. In assignment of error forty-two, defendant alleges that the trial court erred in overruling his objection to the admission of fingerprint evidence, based on the denial of his right to adequately cross-examine the state's expert witness. In assignment of error fortyfour, defendant urges that the trial court erred in denying his motion for a mistrial based on the alleged legal defect in the proceedings which arose when he was denied his right to adquately confront the state's evidence and present his own evidence in defense.
We find no error on the part of the trial court in the denial of defendant's motions and the admission of the expert fingerprint and ballistics evidence presented by the state. It is true that the state's case consisted almost entirely of expert testimony. The state was not required, however, to provide defendant with the means to conduct his defense.
In State v. Clark, 387 So.2d 1124 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 830 (1981) and State v. Madison, 345 So.2d 485 (La.1977), the Louisiana Supreme Court held that the state must supply funds to employ an investigator upon the motion of an indigent defendant who shows that existing evidence is crucial to his defense and that he is without means to obtain that evidence. See also State v. McCabe, 420 So.2d 955 (La.1982). Defendant bears the burden of proof to establish that these requirements have been met. See State v. Clark, 387 So.2d at 1129.
Although defendant is currently represented by the office of the public defender, he was represented at trial by private counsel. His retained attorney filed a pre-trial motion for leave to proceed in forma pauperis. After a hearing, the motion was denied January 17, 1983. We find, therefore, that defendant was not entitled to the appointment of expert witnesses at the expense of the state, and find no denial of his rights of confrontation or the presentation of a defense.

USE OF DEFENDANT'S STATEMENT
Defendant alleges that the trial court erred in permitting the state to introduce the contents of the statement he made after having been taken into custody of the East Baton Rouge Parish deputies. In assignment of error thirty-four, defendant alleges that the trial court erred in permitting the state to impeach his credibility without laying the requisite foundation. In assignment of error thirty-six, defendant alleges that the trial court erred by overruling his objection to the admission of hearsay testimony.
After defendant was located and arrested in Dallas, Texas, three officers with the East Baton Rouge Parish Sheriff's office were dispatched to take him into custody. Lieutenant Maranto, one of the officers, testified that he advised defendant of his Miranda rights, and defendant indicated that he would be willing to talk to the officers. Maranto then testified that Lieutenant (then Sergeant) Bobby Callender asked defendant if he had ever been in the 7-11 store in Baker, Louisiana, and defendant responded that he had not. Callender then described the location of the store more specifically and asked defendant again if he had been in the store, which defendant again denied.
Defendant argues that the state introduced defendant's statement for the sole purpose of impeaching his credibility, and did so without following the methods for impeachment set forth in La.R.S. 15:493. Defendant argues that his privilege against self-incrimination was "chilled" by this action, which forced him either to testify and subject himself to cross-examination, or remain silent and allow the jury to draw negative inferences regarding his credibility.
The United States Supreme Court has recognized that there are at least two distinct *771 reasons why the state would seek to introduce what the defendant considered to be exculpatory statements.
As the court observed in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966):
If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication.

384 U.S. at 476-477, 86 S.Ct. 1629. [Emphasis added.]
The state gave defendant notice that his statement was considered incriminating evidence through its answers to defendant's discovery motions and by providing notice to defendant of its intent to use the statement as an inculpatory statement as provided by La.C.Cr.P. art. 768. Prior to the admission of the statement, the state presented evidence of the free and voluntary nature of the statement, as required by Miranda, and La.R.S. 15:451. We find no error in the use of this statement.
Defendant also argues that the testimony through which the state presented his statement was inadmissible hearsay. Lt. Maranto testified at trial that he accompanied Lt. Callender to Dallas and was present in the police unit when defendant stated that he had never been in the store in Baker. Defendant argues that the testimony is hearsay because Lt. Callender was not subject to cross-examination at trial. Evidence of defendant's inculpatory statement is admissible at trial as an exception to the general rule excluding hearsay testimony. Further, Callender testified at trial immediately after Maranto and gave virtually identical testimony. Defendant argues that Lt. Maranto was actually testifying as to the truth of Lt. Callender's questions. We do not find this argument persuasive. The state offered evidence of Callender's questions to establish the basis for defendant's responses. We find no error in the introduction of this testimony.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Defendant filed motions for a new trial and for a post-verdict judgment of acquittal. The motions were denied October 18, 1984. Although the minute entry for that date does not so reflect, the transcript of that hearing indicates that defendant waived his right to a delay before sentencing.
[2] The indictment also charges a co-defendant, Dedrick Bennett. Bennett confessed to his participation in the robbery, but alleged that he was outside the store when Bell murdered the victims. He was tried separately and convicted of two counts of second degree murder. That conviction has been affirmed. State v. Bennett, 454 So.2d 1165 (La.App. 1st Cir.), writ denied, 460 So.2d 604 (La.1984).

Bennett was subpoenaed to testify at defendant's trial. Although he had been granted immunity, Bennett refused to testify and was held in contempt of court. Bennett was called out of the presence of the jury.
[3] It is good cause for challenge on the part of the state, ... that:

(1) The juror is biased against the enforcement of the statute charged to have been violated, or is of the fixed opinion that the statute is invalid or unconstitutional;
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt; or
(3) The juror would not convict upon circumstantial evidence.
[4] See also the following language:

[W]hether or not a venireman might vote for death under certain personal standards, the State still may properly challenge that venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge. To hold that Witherspoon requires anything more would be to hold, in the name of the Sixth Amendment right to an impartial jury, that a State must allow a venireman to sit despite the fact that he will be unable to view the case impartially. 105 S.Ct. at 851. (Footnote omitted.) [Underscored emphasis added.]
[5] Defendant's argument is based on the following exchange:

Q ... Now, getting back to the elements or the building blocks, specific intent to killhe must prove that. Now, it is one thing to say that the man who was shoplifting and was caught by the manager took the manager's gun, put it to his head and shot him. It certainly could be said that by the circumstances he specifically intended to kill that man but the other person over here who had agreed to do a diversion cannot by law be prosecuted and convicted
A of murder.
Q of murder. Do you understand that?
A Yes, sir.
Q Our higher court has recently said in this area that juries
MR. LOTWICK: Judge, I'm going to object to any discussion of any jurisprudence regardless of what it is. It's improper during theat this part of theduring jury selection.
[6] "A continuance is the postponement of a scheduled trial or hearing, and shall not be granted after the trial or hearing has commenced. A recess is a temporary adjournment of a trial or hearing that occurs after a trial or hearing has begun." La.C.Cr.P. art. 708. "A jury trial commences when the first prospective juror is called for examination." La.C.Cr.P. art. 761. Defendant's motion for a continuance was clearly untimely. However, a motion for a recess is evaluated by the same standards as a motion for a continuance. State v. Warren, 437 So.2d 836 (La.1983).