691 So.2d 792 (1997)
STATE of Louisiana
v.
Benjamin T. MORRIS.
No. 96 KA 1008.
Court of Appeal of Louisiana, First Circuit.
March 27, 1997.
*794 Duncan Kemp, III, District Attorney by Charlotte Hebert, Assistant District Attorney, Amite, for Appellee State of Louisiana.
J. Garrison Jordan, Ron S. Macaluso, Hammond, for Defendant-Appellant Benjamin T. Morris.
Before WHIPPLE, PITCHER and FITZSIMMONS, JJ.
*795 FITZSIMMONS, Judge.
Defendant, Benjamin T. Morris, was charged by grand jury indictment with aggravated rape, a violation of La. R.S. 14:42. After trial by jury, defendant was found guilty as charged. The trial court sentenced defendant to imprisonment at hard labor for life, without benefit of parole, probation or suspension of sentence. Defendant has appealed, urging seven assignments of error.
The female victim of the instant offense, a college student, testified that, on the night of August 31, 1994, she and two of her girlfriends left Walker, Louisiana and drove to Baton Rouge, Louisiana. In Baton Rouge, they went to three nightclubs, Funny Bone Comedy Club, Caterie and Texas Club. Later that night, the three women returned to Walker. The victim exited her friend's car, got into her own car, and proceeded to go home alone.
The victim testified that on her way home, at about 1:15 a.m. on September 1, she spotted a car parked on the side of the road about a half mile from her home. The hood of the parked car was up, and the car's lights were flashing. The victim stopped to see if she could render assistance to the driver of the car. When she asked the male driver if he was having car trouble, he replied in the affirmative. The victim's parents were expecting her home for her 1:30 a.m. curfew. After providing the man with her jumper cables, which were ineffective, she offered him the use of her cellular phone. He refused. The victim agreed to give the man (who indicated that he lived nearby) a ride home. The man got into the victim's car with her. She began driving, following his directions. To this point, the man had repeatedly thanked the victim for helping him and appeared to be a nice person. Additionally, he identified himself as having the same surname as the victim, and spoke to her about other persons with that surname.
When the man asked the victim to stop the car for him "to go to the bathroom," she complied with the request. The man exited the car. However, when he reentered the car, he was holding a knife. The man reached over from the passenger side of the car, grabbed the victim at the back of the head by her hair, put the knife to her throat, and told her not to do anything stupid. He told her she could exit the car, but he continued holding her hair and the knife. The defendant crawled over the console in the car as the victim proceeded to get out of the car. When the man's arm was inside the driver's side door of the car, the victim tried at least three times to slam the door on his arm, in what proved to be an unsuccessful attempt to escape.
After the two of them exited the car, the man raped the victim. He then struck her about the head and face. The man told the victim that if she brought up his name in a conversation or if the police came looking for him "he would be back to get [her]," not with a knife, but rather "with a twenty." The man then drove away in the victim's car. He instructed her not to do anything until she could no longer see the headlights on the car. The victim waited for the lights to disappear, found her shorts, and then ran to the residence of Woodrow Sibley, Jr. After the victim awakened Woodrow, he tried to wipe some of the blood from the victim's face, then took her to the home of Ms. Dot Sibley, his mother. The police and the victim's parents were notified.
Deputies Mike Lanier, Mike Zeigler, and Detective Willie Turner of the Livingston Parish Sheriff's Office responded by going to the home of Ms. Sibley. The victim gave a description of the rapist, his clothing, and the knife that he used. From there, the officers went to the crime scene with the victim. At the crime scene, Deputy Zeigler found a wallet. Zeigler opened the wallet within the view of the victim. The wallet contained a photograph that Zeigler recognized as defendant's picture, and the victim identified the picture as depicting the rapist. The police also found the victim's underwear.
Det. Turner proceeded with the victim to the hospital, where she made a tape recorded statement to him. Pictures were taken of injuries to her face and body. The victim was physically examined at the hospital by Dr. Keith Mack.
In the meantime, Deputy Zeigler had gone to the home of defendant's mother where he *796 found defendant and arrested him. Deputy Lanier joined Zeigler at the home and obtained various items of clothing from defendant's mother that apparently fit the victim's descriptions of clothing worn by the rapist. Defendant's pocketknife was also turned over to the police. After defendant was advised of and waived his Miranda rights, defendant made a September 1, 1994 tape recorded statement to Det. Turner. At trial, the victim made an in-court identification of defendant as the rapist.

ASSIGNMENT OF ERROR NO. ONE
In this assignment, defendant contends that the evidence was insufficient to convict him of aggravated rape. More specifically, he argues that the evidence, and particularly the victim's trial testimony, did not prove the requisite sexual penetration element of the offense.
In reviewing claims challenging the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). See also La.Code Crim. P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988).
Aggravated rape, as defined in La. R.S. 14:42(A), at the time of this offense, provided in pertinent part, as follows:
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.

* * * * * *
La.R.S. 14:41 further defines the term "rape" as follows:
A. Rape is the act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
B. Emission is not necessary and any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime.
The victim gave the following testimony on direct examination. Defendant placed the knife to her throat and grabbed her by the hair. He told her not to do anything stupid. The victim told him that she would not because he had the knife, and if he wanted to, he could kill her. Defendant's response was "that's right." After they exited her car, defendant stood behind her holding the knife to her throat. Defendant threatened to cut her if she did not do what he wanted. When defendant told her to pull down her shorts, she told him she did not want to because she was "on [her] period" and she and defendant might be related. The defendant told her he did not care. The victim was wearing a tampon, but did not tell defendant. Defendant helped her push down her shorts. The victim stated that defendant apparently pulled down his pants and was going to "try and penetrate in [her], standing up," but it "didn't work." Defendant told the victim to spread her legs. She told defendant she could not because her "shorts were around [her] ankles." However, at his insistence she complied, but "nothing happened." Defendant told her to squat, and again "nothing happened." When the prosecutor asked the victim if defendant had tried to penetrate her anally, she replied that "[a]t the time I didn't recall," "I didn't know." When defendant told the victim to lie on the ground, she complied. Defendant forced her to help him achieve an erection.
At this juncture of her direct examination, the victim gave the following testimony:
Q And then what happened?

*797 A He penetrated.
Q And how did that feel?
A It was excruciating.
Q Why was that?
A II assume because I had a tampon in, I don't know.
Q Okay. Was it a one [sic] painful, or did it occur again and again, or what?
A It occurred again, probably two or three times.
During cross-examination, in response to defense counsel's questions, the victim stated that she did not see defendant penetrate her with his penis. On further questioning, she stated that she did not know whether he penetrated her anally or vaginally. She maintained that she had never previously met defendant, that she did not have consensual sex with defendant, and that she had not had sex with any other man within seventytwo hours of the instant incident.
Thereafter, on redirect examination, the victim testified as follows:
Q [Victim,] did you see him penetrate you?
A No.
Q Did you feel penetration?
A Yeah.
Q How is it that you know you were penetrated?
A Because itI hurt.
In State Exhibit S-26, defendant's September 1, 1994, tape recorded statement to Det. Turner, defendant unequivocally admitted to having "had sex" with the victim, but maintained that the encounter was consensual. Defendant stated that about 12:45 or 1:00 a.m. on the night in question, defendant met the victim at Junior's Food Mart in Walker, Louisiana. After a brief conversation, she asked him if he wanted to have sex. Defendant agreed to her proposition, and the two left in separate cars. Along the way, they stopped. The defendant stated that steam was coming out of the hood of his car, but the car was not broken down. At first, the couple got into the victim's car, changed their minds, and got into the defendant's car. At some point, he used jumper cables, but "it sparked," so he knew it wasn't the battery.
He tried to start the car again, and it started. They drove to an unpaved road, exited defendant's vehicle, and "had sex" on the ground. After they finished, the victim asked defendant to take her to see his mother and talked about the victim and defendant "seeing each other." When defendant declined to agree to do either, the victim began calling him names and told him to leave, she would find her own way back. Defendant left the victim on the unpaved road, approximately two miles from her car. Defendant returned home in his own car at about 2:00 a.m. Defendant denied beating the victim.
Dr. Keith Mack testified that he physically examined the victim on the morning of September 1. Dr. Mack asked the victim if there had been penetration of her vagina, anus, and mouth. The victim responded that there was successful penetration of her vagina and anus, but no mouth contact at all. The doctor collected the relevant evidence, such as the victim's clothing and vaginal and anal swabs for the rape kit, which was sent to the Louisiana State Police Crime Laboratory. The doctor stated that his examination did not find evidence of any forcible penetration in the vagina or rectum.
Carolyn Booker, an employee of the Louisiana State Police Crime Laboratory, was accepted by the court as an expert in the field of forensic serology. She analyzed various evidentiary items in this case obtained from the victim by Dr. Mack. She did not test the victim's tampon included in the kit because it had been improperly packaged.
Ms. Booker's analyses of blood samples showed the victim was a type O secretor with a phosphoglucomutase (PGM) enzyme type two-one, sub-type minus one plus two. The defendant was a type A secretor with a PGM type one and a sub-type plus one. Ms. Booker tested the anal swabs from the victim's rape kit and found blood and semen. The blood tested as PGM type two-one with a sub-type minus one plus two, consistent with the victim's blood type. Ms. Booker stated that the semen was from a type A secretor, which is defendant's type, and that the presence of semen on the swabs was consistent with anal penetration. Ms. Booker's tests on the victim's shorts revealed blood and semen *798 in the crotch. Ms. Booker stated that the A blood group substance found on the shorts was from an A secretor and that the H substance could have come from an O secretor or an A secretor. Tests conducted on the defendant's blue jeans by Ms. Booker revealed blood on the jeans. Ms. Booker could not determine the blood type, but did ascertain that the PGM on the jeans was the same as that of the victim. Ms. Booker also determined that a stain on the inside fly area of the jeans was a feces stain.
Photographs taken at the hospital of the victim's blackened and swollen eye, and other injuries, were submitted as evidence.
Viewing all the evidence in the light most favorable to the state, any rational trier of fact could have found beyond a reasonable doubt that defendant was guilty of aggravated rape of the victim. Accordingly, this assignment is without merit.

ASSIGNMENT OF ERROR NO. TWO
In this assignment, defendant contends that the trial court committed reversible error by denying his motion to continue the hearing on his post trial motions for new trial and post verdict judgment of acquittal, and by denying the post trial motions.[1]

Continuance
At the hearing on the post trial motions, defendant orally moved to continue the hearing on the basis that a subpoenaed witness, Arthur Ballard, had not been served and that the testimony of Ballard was "essential" to the disposition of the post trial motions. The subpoena was issued January 29, 1996 and the post trial motions hearing was held on February 15, 1996. The trial court denied the motion for continuance.
The record reflects that Mr. Ballard was inside Woodrow Sibley's residence when the victim came to the residence on the night of the incident. At the hearing on the post-trial motions, defendant sought to introduce Mr. Ballard's testimony to rebut the trial testimony of the victim and Woodrow Sibley concerning the victim's physical appearance at the time she came to the residence. The court allowed defense counsel to make a proffer, which consisted of a taped statement made by Mr. Ballard on December 12, 1995, to defense counsel, a transcript of the statement, and some of the photographs of the victim taken by Det. Turner at the hospital. Charlotte Herbert, the prosecutor, objected to any continuance of the case, and asserted that Mr. Ballard's testimony was not new, material evidence. She argued that Mr. Ballard had been subpoenaed and was present at the trial. Ms. Herbert took the witness stand and testified that Mr. Ballard was present at trial, accompanied by Woodrow Sibley, on October 23, 1995, the first day of jury selection in this case. Mr. Ballard told Ms. Herbert that defense counsel knew that Mr. Ballard was there. Ms. Herbert testified that she instructed Mr. Ballard to make sure defendant's trial counsel knew Mr. Ballard was at the trial. Mr. Ballard responded that he had done so.
Mr. Ballard was not called by defendant's counsel at trial, and did not testify at trial. The trial transcript contains no objection or complaint by the defendant concerning Mr. Ballard's absence or failure to testify. At the close of the state's case, the court asked if the decision of the defendant not to put on any testimony was a "knowing" strategy by counsel and a "knowing" decision by the defendant. Both agreed.
The trial court has great discretion in ruling on continuances. The ruling will not be disturbed absent an abuse of that discretion. State v. Terry, 359 So.2d 172, 174 (La.1978).
We find no abuse of discretion by the trial court in denying the motion to continue. Mr. Ballard was not a witness that was unknown to the defense before trial. Furthermore, after reviewing the defense proffer, even assuming arguendo that Mr. Ballard's anticipated testimony was newly discovered evidence, defendant failed to establish that it was of such a character that it would produce a different verdict at a retrial. See generally *799 State v. Maize, 94-0736, p. 27-28 (La.App. 1st Cir. 5/5/95); 655 So.2d 500, 517, writ denied, 95-1894 (La. 12/15/95); 664 So.2d 451. The testimony related to the degree of the victim's injuries to her face, not whether she was injured.

Motions for New Trial and Post Judgment Verdict of Acquittal
Defendant advances the following grounds for granting him a new trial: (1) the verdict is contrary to the law and the evidence; (2) trial court rulings constituting prejudicial errors and (3) the ends of justice would be served by granting a new trial. See La.Code of Crim. P. art. 851(1), (2), & (5). He asserts the trial court erred in denying his motion.
The first ground for a new trial asserted by defendant, that the verdict was contrary to the law and evidence, actually refers to the sufficiency of the evidence; as did the defendant's motion for post verdict judgment of acquittal. Sufficiency is properly raised by a motion for post judgment verdict of acquittal, not by a motion for a new trial. State v. Gaines, 633 So.2d 293, 298 (La.App. 1st Cir.1993), writ denied, 93-3164 (La. 3/11/94); 634 So.2d 839. However, the substance of this claim was addressed and found meritless in assignment of error number one.
Under La.Code Cr. P. art. 851(1), the trial court can consider only the weight of the evidence, not the sufficiency, and sits as a thirteenth juror. Id. If the defendant meant to also argue that the weight of the evidence warranted a new trial, our review is limited to whether the trial court abused its wide discretion. See State v. Caminita, 411 So.2d 13, 17 (La.), cert. denied, 459 U.S. 976, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982). We find no abuse of discretion.
In support of the second ground, defendant makes essentially the same arguments addressed and found meritless in assignment of error number six, with the exception of one additional argument. The additional argument is that the prosecutor improperly used testimony given by the victim at a September 13, 1994 pretrial hearing to prove penile penetration. This additional argument apparently refers to the fact that the prosecutor read an excerpt of the victim's testimony from the pretrial hearing during the victim's redirect examination at trial. However, prior to that redirect, during the victim's cross-examination, defense counsel had read excerpts from the victim's testimony at that same hearing in an apparent effort to cast doubt upon the victim's credibility and to dilute her direct testimony on penetration. On redirect, the same transcript was used to clarify and reconcile alleged inconsistencies in the victim's responses at trial and at the hearing.
The record does not reflect that defense counsel made any contemporaneous objection during the victim's redirect examination. Thus, the additional argument represents a new ground for objection not raised at the trial court level. "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." La.Code Crim. P. art. 841. For that reason, the alleged error is not properly before this Court.
Finally, defendant's assertion that he should have been granted a new trial on the basis that the ends of justice would be served, presents no specific allegations of error for this court to review. See State v. Walder, 504 So.2d 991, 994 (La.App. 1st Cir.), writ denied, 506 So.2d 1223 (La.1987). Article 851(5) allows the trial court to grant a new trial if "the ends of justice would be served ... although the defendant may not be entitled to a new trial as a matter of strict legal right." The grant or denial of a new trial based on article 851(5) has been held in the past to be not subject to review by the appellate courts. State v. Savoie, 448 So.2d 129, 135 (La.App. 1st Cir.), writ denied, 449 So.2d 1345 (La.1984). This may well not be the case in perpetuum. However, under these circumstances, we find no abuse of discretion in the trial court's denial of defendant's post trial motions.

ASSIGNMENT OF ERROR NO. THREE
In this assignment, defendant contends that the trial court erred by denying his challenges for cause of Michael Hand and Daniel Austin, Jr., who served on the jury, *800 and two prospective jurors, Sharon Taylor and Bryan Muse, whom the defense peremptorily challenged. Defendant argues that each of these cause challenges should have been granted on the ground of partiality.
Initially, we note defendant exhausted his peremptory challenges. However, even if defendant had not exhausted his peremptory challenges, he would not have been precluded from complaining of the rulings denying these challenges for cause. See State v. Burge, 498 So.2d 196, 203 (La.App. 1st Cir. 1986).
La.Code Cr. P. Art. 797(2) and (3) provide as follows:
The state or the defendant may challenge a juror for cause on the ground that:
* * * * * *
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict[.]
* * * * * *
In State v. Lewis, 391 So.2d 1156, 1158 (La.1980), the Louisiana Supreme Court stated that:
[S]ervice on a criminal jury by one associated with law enforcement duties must be closely scrutinized and may justify a challenge for cause, although such association does not automatically disqualify a prospective juror. (citations omitted).
It is well-settled that relationship to a law enforcement officer is not, of itself, grounds for a challenge for cause. Rather, the question presented is whether the prospective juror could assess the credibility of each witness independent of his or her relationship with members of law enforcement. State v. Collins, 546 So.2d 1246, 1253 (La. App. 1st Cir.1989), writ denied, 558 So.2d 599 (La.1990).
A trial court has broad discretion in ruling on challenges for cause. State v. Welcome, 458 So.2d 1235, 1241 (La.1983), cert. denied, 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 152 (1985). A refusal by a trial court "to excuse a prospective juror on the ground that he is not impartial is not an abuse of discretion where, after further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence." State v. Copeland, 530 So.2d 526, 534 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989).

Michael Hand and Shirley Taylor
Michael Hand and Shirley Taylor were members of the first panel of fourteen prospective jurors. During voir dire by the trial court, Michael Hand testified that he knew prosecutor Charlotte Herbert, stating that his mother worked as a receptionist at the dental office of the father of Ms. Herbert. However, the court further questioned Hand as follows:
Q All right, would that fact in any way influence you in this case?
A Probably, in certain ways, I guess it would.
Q All right, do you think that it would influence you, for example, I'm going to be instructing you that the State has the burden of proving every element of the offense against the defendant, and to prove it beyond a reasonable doubt. Do you think you might be able to set asidedo you think you could be able to set aside the personalities involved in the case, and make a decision based solely upon the evidence and the testimony that you hear?
A Yes sir.
Q Now, the fact that you know Ms. Herbert, for example, do you think that you would lean in her favor simply because your mother works for her father?
A No.

*801 Q ... And you are telling me that you don't think that it would?
A I'm notI'm not really sure. I guess, if the facts were clear, it wouldn't.
Q Well, you understand that Mrs. Herbert is not going to be testifying in this case?
A Yeah.
Q She's going to be putting on witnesses and asking those witnesses questions; it's going to be up to you to either believe or disbelieve the witnesses and to give them whatever weight you think their testimony deserves, you understand that?
A Yes sir.
Q That's the task that is before you; would you be able to set aside the fact that your mother works for her father?
A Yes sir.
Defense counsel challenged Michael Hand for cause because Hand's mother worked for the prosecutor's father. In denying the challenge, the court noted that it had determined Hand could be fair. We agree. We find no abuse of the trial court's discretion in the denial of the challenge for cause.
In response to voir dire by the court, Sharon Taylor testified that her husband works for the Livingston Parish Sheriff's Office as a road deputy. The record reflects further exchange between the court and Sharon Taylor as follows:
Q Obviously, you're going to have to make the decision about believability of witnesses. It may be that deputies are called to testify, I don't know, but counsel has indicated that they're on the witness list. If deputies are called, would that in any way, influence your ability to evaluate all of the evidence and all of the testimony and make a dedicision (sic) based upon the evidence and the testimony?
A I don't know if that would change my opinion on this or not, but I do have three daughters, and that's the first thing that went through my mind, on this, is what I would think if this was my daughter.
* * * * * *
Q Well, obviously, rape is an emotional kind of crime and it evokes emotional, knee-jerk reactions. We all understand that. Everyone of us here understands that. But, you understand that the State has got to come forward with evidence that will convince you beyond a reasonable doubt, of the guilt of the defendant, as to every element?
A I realize that.
Q Will you require them to convince you to that extent, before you would return any kind of a verdict of guilty in this case?
A Well, I realize this is two people's lives in my hands, here, yes, I wouldI would think this out thoroughtly (sic).
Q Sure.
A Yes.
Q I mean, it's serious business, obviously.
A Yeah.
* * * * * *
Q Now, you didn't respond when I asked you about the fact that you had three daughters; would you in any way, allow that to color your reason and your logic in listening to the testimony and the evidence in this case?
A II really don't know. To be very honest, I don't know.
Q Well, are you automatically going to return a conviction, because you have three daughters?
A No sir, not for that reason, no sir.
Q Yes. I mean, you're going to listen to the testimony, and you're going to listen to the evidence?
A Yes sir.
Q And you're going to assign whatever believability you think is appropriate to whichever witness that comes forward and testifies, correct?
A Yes sir.
Q Okay. All right, that's all the law asks of you.
Later, during voir dire by defense counsel, counsel questioned Sharon Taylor concerning her husband being a deputy sheriff. Counsel noted that there would be law enforcement officers testifying at trial. Defense counsel noted that the officers might have "pretty strong opinions" that counsel would be disputing *802 and that although he was not saying officers might lie, they might be mistaken. The record reflects that at this point, the following exchange occurred between defense counsel and Juror Taylor:
Q. Can you put aside the fact that you're married to a deputy and a man who you know will be telling the truth, when you hear a deputy on that stand, can you consider and listen to it and feel like he may be mistaken, can you give us that benefit of that doubt?
A That uniform has nothing to do with what he's gonna (sic) testify about.
In further questioning by defense counsel, Sharon Taylor stated that she had not heard her husband say anything about this case. She also stated that she does not talk to her husband about his job.
The defense challenged Sharon Taylor because her husband is a deputy and her responses revealed her concern in regard to her three daughters. In stating its reasons for denying the challenge of Mrs. Taylor for cause, the court indicated it felt that she could be fair and impartial notwithstanding the fact she has three daughters. The court stated that the fact her husband was a deputy was not a ground, in and of itself, for a challenge for cause.
Mrs. Taylor's responses affirming her ability to be impartial in spite of her concerns about her three daughters are not as clear as we would like. When a trial judge is faced with such a decision, it is better to grant the challenge for cause, rather than require the defendant to use one of a limited number of peremptory challenges. Rehabilitation of jurors is a legitimate tool, but one that should be used only in a fair and clear search for impartiality. Although Mrs. Taylor's case is not as clear as Mr. Hand's, based on the record before us, we cannot say that the trial court abused its discretion in its denial of the challenge for cause against Mrs. Taylor.

Daniel Austin, Jr. And Bryan Muse
Daniel Austin, Jr. and Bryan Muse were members of the second panel of fourteen prospective jurors. Questioning by the court elicited testimony from Bryan Muse that he was a second cousin of Deputy Muse (who was serving as court bailiff in this case). However, Bryan Muse stated that he would not in any way be influenced by the fact that his cousin would be serving as bailiff. Bryan Muse gave testimony during defense counsel's voir dire that he understood a policeman might give inaccurate testimony and that, if such testimony caused him to have doubt in his mind, he would give defendant the benefit of that doubt. In response to questioning by the court, Mr. Austin, Jr. testified that his son Daniel Austin, III, works for the Livingston Parish Sheriff's Office as a road deputy. Daniel Austin denied he was biased due to his son's employment, or that it would influence his decision in this case. In further testimony given during defense counsel's voir dire, Mr. Austin, Jr. stated that he seldom sees his son and does "not really" talk to his son about his son's job. Defense counsel challenged Mr. Austin, Jr. for cause on the ground that Mr. Austin's son was a deputy sheriff. Counsel challenged Bryan Muse for cause based on his being Deputy Muse's cousin. The court denied both challenges.
Based on the record before us, we find no abuse of discretion by the court in denying the challenges against Mr. Muse and Mr. Austin, Jr.

ASSIGNMENT OF ERROR NO. FOUR
In this assignment, defendant contends that the trial court committed reversible error by prohibiting defense counsel from conducting voir dire of prospective jurors about their life experiences and beliefs regarding nightclubs, male strippers, and DNA testing. Defendant argues that the prohibition improperly restricted the scope of voir dire.
Michael Hand, a pharmacist, was the first prospective juror questioned by defense counsel. Defense counsel asked Mr. Hand if he had heard of the Texas Club, if he had been there, and if there were male strippers there. Mr. Hand replied that he had heard of the club, had been to it, and thought there were male strippers who performed at the club. At that point, the prosecutor objected. Outside the hearing of the prospective jurors, *803 the court disallowed questioning concerning the Texas Club, because the subject of the Texas Club related to facts that the court anticipated would be brought out in evidence during the trial, id est, testimony by the victim that she had been to the Texas Club the night she was sexually assaulted. The court also ruled it would not permit questioning about male strippers.
Defense counsel then resumed his voir dire of Michael Hand. Counsel posed questions relating to whether Mr. Hand had ever heard of anyone falsely accused and whether he had watched the O.J. Simpson trial on television. In that context, counsel asked Mr. Hand if he knew what DNA means. Mr. Hand replied in the affirmative. However, when defense counsel asked Mr. Hand what it meant, the prosecutor objected to the question. In a discussion at the bench outside the hearing of the prospective jurors, the state objected because defense counsel was attempting to elicit testimony from Mr. Hand (who had a medical background) on the subject of DNA. Defense counsel explained that the state had not had any DNA tests run in this case and what he wanted to determine from the prospective jurors was whether they thought it was fair for the state to have certain scientific tests conducted and not others, such as DNA. The trial court sustained the state's objection.
After the court imposed these limitations, defense counsel was permitted to question prospective jurors on the three panels on the subjects of dancing, playing cards, drinking alcoholic beverages, nightclubs in general (but not specific clubs such as the Texas Club), and whether police investigations should be complete.
An accused in a criminal case is constitutionally entitled to a full and complete voir dire examination and to the exercise of peremptory challenges. La. Const. Art. I, Sec. 17. Louisiana law provides that the trial court, the state, and the defendant shall have the right to examine prospective jurors. La.Code Crim. P. art. 786; State v. Bell, 477 So.2d 759, 765 (La.App. 1st Cir. 1985), writ denied, 481 So.2d 629 (La.1986). Voir dire examination is designed to discover grounds for challenges for cause and to secure information for an intelligent exercise of peremptory challenges. State v. Williams, 560 So.2d 519, 523 (La.App. 1st Cir.1990). The defendant should be allowed "to make such inquiries of prospective jurors as will enable him to secure his constitutional rights by eliciting facts which show grounds for challenges. His `right to intelligently exercise cause and peremptory challenges may not be curtailed by the exclusion of nonrepetitious voir dire questions which reasonably explore the jurors' potential prejudices, predispositions or misunderstandings relevant to the central issues of the particular case.'" State v. Bell, 477 So.2d at 766, quoting State v. Duplessis, 457 So.2d 604, 606 (La.1984). The scope of voir dire examination is within the sound discretion of the trial court. Its rulings will not be disturbed on appeal in the absence of a clear abuse of discretion. State v. Williams, 560 So.2d at 523. However, "voir dire may not serve to pry into [jurors'] opinions concerning evidence to be offered at trial." State v. Corbin, 285 So.2d 234, 236 (La.1973). Hypothetical questions and questions of law that call for prejudgment of any supposed set of facts are not permissible on voir dire. State v. Thomas, 589 So.2d 555, 565 (La.App. 1st Cir.1991).
The disallowance of a proper question on voir dire examination does not automatically result in reversible error. In evaluating the fairness of the trial court's ruling, the entire voir dire examination must be considered. State v. Robinson, 404 So.2d 907, 911-912 (La.1981); State v. Morgan, 459 So.2d 6, 9 (La.App. 1st Cir.1984), writ denied, 462 So.2d 1263 (La.1985).
After considering the limitations placed upon defense counsel's questioning, and the lines of questioning which were permitted by the court in light of the above jurisprudence, we find no abuse of discretion by the trial court. Contrary to the defendant's argument, the trial court's rulings did not unduly restrict defense counsel's voir dire examination.

ASSIGNMENT OF ERROR NO. FIVE
In this assignment, defendant contends that the trial court committed reversible error *804 by denying defense motions for a mistrial based on the state's failures during pretrial discovery to produce a probable cause sheet, or PC sheet, prepared by Deputy Zeigler, and the audiotape of defendant's September 1,1994 taped statement to Det. Turner.

Probable Cause Sheet
During Deputy Lanier's trial testimony, he stated that the probable cause sheet is a sheet filled out by the police at the time of arrest stating the probable cause for the arrest. Deputy Zeigler had filled out the sheet for defendant's arrest. Out of the jury's presence, defense counsel moved for a mistrial because the state had not furnished a copy of the sheet to the defense pursuant to the defense motion for discovery. The prosecutor responded that she had seen the sheet on Monday (apparently the day before trial began) and that Deputy Zeigler had it. The court ruled that the defense was entitled to the sheet, declared a recess, and directed the prosecutor to furnish a copy of the sheet to the defense. Following the recess, the prosecutor stated that she had given a copy to the defense. The court then denied the motion for mistrial, stating that it found the sheet was irrelevant.
In asserting that he was prejudiced by the untimely disclosure of the sheet, defendant appears to contend that the sheet would have disclosed to him the victim's allegation that she had slammed the car door on his arm during the incident. Defendant reiterates a claim he made to the trial court that, if he had been furnished the sheet earlier, he could have made a determination of whether a physical examination would have found evidence of a physical injury to his arm. Such evidence could be used to rebut the allegation by the victim that she slammed the car door on his arm.
The record reflects that defendant filed his motion for discovery on September 26, 1994. In the state's October 11, 1994 response to the discovery request, the state furnished defendant with police reports, which disclosed the victim's allegation of trying to slam the door on defendant's arm. Also, during trial, defense counsel questioned Deputies Lanier and Zeigler and Det. Turner about their recollection of the condition of defendant's arms. Deputy Lanier stated that he was not asked to examine defendant's hands or arms for injury and that he did not look at them. Similarly, Deputy Zeigler stated that he was never asked to make such an examination of defendant's hands and arms. However, Det. Turner testified that when he took defendant's taped statement on September 1, defendant was wearing short sleeves. Det. Turner stated that he did not see any bruises on defendant's arms or evidence that a car door had been slammed on defendant's arms. Det. Turner stated that, if there had been any mark on defendant's arms, he probably would have seen it. No other evidence was presented at trial on the condition of defendant's arms. Clearly, under these circumstances revealed by Det. Turner's testimony and the earlier disclosure of the police report, defendant was not prejudiced by the alleged failure to timely furnish the probable cause sheet.

Defendant's Taped Statement
At trial, the state presented the testimony of Det. Turner to establish the foundation for the admissibility of the September 1 taped statement by defendant. Defendant orally moved to suppress the statement and made a motion for a mistrial, contending that there was a discrepancy between the transcript the state had provided the defense during discovery and the tape. Defendant asserted that a question was missing from the last page of the transcript. The record does not reflect that defendant ever disclosed to the trial court what question was missing, nor does he make such a disclosure on appeal. The transcript was not included in the record as evidence. The jury heard only the tape.
In denying defendant's motions, the trial court noted that no written motion to suppress had been filed and the oral motion to suppress was untimely. The court stated that the audiotape had been available to defendant during pretrial discovery for over a year and that, if defendant had not listened to the audiotape previously, it was too late for him to complain. The court also noted that it did not know if any discrepancy existed and that the tape was the best evidence of *805 its content. We find no abuse of discretion by the trial court in this situation.
Defendant also asserts that the trial court should have declared a mistrial because, when the tape was played during trial, the jury heard Det. Turner say on the tape that defendant was being charged with aggravated rape and theft of the victim's vehicle. Defendant argues that the reference to charging him with the theft was an improper reference to another crime, evidence of which was inadmissible. Thus, he was entitled to a mistrial under La.Code Crim. P. art. 770(2).
We note that the record does not reflect an objection or motion for mistrial was made by defendant to the reference at issue. Moreover, we are satisfied that the taking of the victim's vehicle was part of the res gestae. The prohibition against references to inadmissible evidence of other crimes under La.Code Crim. P. art. 770 does not include evidence which forms part of the res gestae. See State v. Leason, 477 So.2d 771, 777 (La.App. 1st Cir.1985).

ASSIGNMENT OF ERROR NO. SIX
In this assignment, defendant contends that the trial court committed reversible error by allowing the state to introduce into evidence the victim's taped statement to Det. Turner recorded at the hospital on September 1, 1994. The statement related her account of the alleged rape. Defendant argues that the tape was improperly used during the testimony of Det. Turner, to rehabilitate the victim's testimony, solicited on cross-examination, that she was not certain that penetration occurred.
Defendant asserts that this statement was not admissible as the victim's initial complaint, because the victim had given about four statements prior to making the taped statement. Defendant argues this statement was inadmissible hearsay, and not nonhearsay under La.Code Evid. Art. 801(D)(1)(d). La.Code Evid. art. 801(D)(1)(d) defines a statement as nonhearsay if the declarant testifies at the trial or hearing, is subject to cross-examination concerning the statement, and the statement is consistent with the declarant's testimony, and one of initial complaint of sexually assaultive behavior. He submits that admitting the statement into evidence violated his constitutional rights to a fair trial and to cross-examine and confront his accuser.
The victim was the first witness who testified at trial. Woodrow Sibley, Deputies Lanier and Zeigler, and Det. Turner then testified in that order. The victim's taped statement was admitted into evidence over defense counsel's objection during the state's redirect examination of Det. Turner.
Woodrow Sibley testified that, when the victim came to his home on the night of September 1, she was yelling that she had been raped and beaten. The victim was at his home only about five minutes before he took her to his mother's residence. They were there for about thirty to forty-five minutes before the police arrived. According to Mr. Sibley, the victim only told him and his mother that she had been raped and beaten up "and stuff," and that the victim did not "really talk about it much" until after the police got there. Deputy Lanier, the first officer to respond, testified that the victim related to him that she had been raped and gave him "a pretty good account of the situation," but that she did not provide him "a whole lot" of details about the rape. Deputy Zeigler testified that Lanier was at Ms. Sibley's residence when he arrived there and that he stayed outside and did not hear the victim's statement to Deputy Lanier. Det. Turner testified that he spoke to the victim at Ms. Sibley's home, but that the victim did not go into "great details" at that time. Det. Turner stated that he was at the residence for about fifteen minutes, and that the victim's taped statement was made to him within one hour after he and the victim got to the hospital.
In this situation, we find that the victim's taped statement to Det. Turner was admitted improperly. It was not the victim's initial complaint because it followed earlier complaints to Woodrow Sibley and Ms. Sibley, Deputy Lanier, and Det. Turner. We are concerned about the effect of the statement on the jury because the jury exhibited an interest in it during deliberations. The jury asked for the victim's and defendant's *806 taped statements, the pictures submitted into evidence, and Dr. Mack's report. Except for the pictures, the trial court denied the requested items.
Our review of the tape revealed that, in general, the taped statement was materially consistent with the properly admitted testimony given by the victim at trial relating the circumstances of the incident. On the tape, the victim related the sequence of the events in the same manner, and stated that defendant "got in finally ... I think twice." The difference between the taped statement and the trial testimony is the absence of the victim's statements of uncertainty about penetration that were solicited on cross-examination. Those questions were not asked by the police officer during the taped statement. The issue becomes whether the verdict was attributable to the taped statement.
We find that it was not. The jury had other properly submitted evidence of penetration it could have relied on: the presence of semen and blood substances from an A secretor on the swab that was taken from the anal cavity, and the defendant's own admission that the couple had sex. See State v. Francis, 560 So.2d 514, 517-518 (La.App. 1st Cir.), writ denied, 565 So.2d 942 (La.1990). In light of an independent basis for a finding that penetration occurred, and the mostly repetitive nature of the taped statement, we find that the error of admitting the September 1 taped statement of the victim does not quite rise to the level of reversible error, in this particular case. See State v. Johnson, 94-1379, pp. 13-14 (La.11/27/95); 664 So.2d 94, 100.

ASSIGNMENT OF ERROR NO. SEVEN
In this assignment, defendant contends that the mandatory life sentence provided in La. R.S. 14:42 denies him due process and equal protection and constitutes cruel, unusual, and excessive punishment in violation of the Louisiana and United States Constitutions. He argues that the mandatory life sentence for aggravated rape deprives him of equal protection, because it discriminates against him and other similarly situated individuals as compared to persons convicted of felonies that do not carry such a sentence.
We reject defendant's contentions. With respect to statutes not requiring capital punishment, mandatory sentences are not unconstitutional. State v. Farria, 412 So.2d 577, 579 (La.1982). In repeatedly upholding the constitutionality of the mandatory life sentence for aggravated rape, the Louisiana Supreme Court has determined that this statutory sentencing provision is a valid exercise of the state legislature's prerogative to determine the length of sentence for crimes classified as felonies. See State v. Foley, 456 So.2d 979, 981 (La.1984); State v. Prestridge, 399 So.2d 564, 582 (La.1981), and the cases cited therein.

PATENT SENTENCING ERROR
We have discovered a patent sentencing error. Neither the minutes nor the sentencing transcript show that the trial court, in imposing sentence, gave defendant credit for time spent in actual custody prior to sentencing. Such an allowance of credit is mandatory. La.Code Crim. P. art. 880. Patent sentencing error occurs when the trial court fails to specify credit for time served. State v. Greer, 572 So.2d 1166, 1172 (La.App. 1st Cir.1990). Accordingly, we find patent sentencing error and amend the sentence to reflect that defendant is to be given credit for time served prior to the execution of his sentence. See La.Code Crim. P. art. 882 A. Resentencing is not required. However, we remand this case and order the district court to amend the commitment and minute entry of the sentence to reflect that defendant is given credit for time served. See State v. King, 604 So.2d 661, 670 (La.App. 1st Cir. 1992).
CONVICTION AFFIRMED. SENTENCE, AS AMENDED, AFFIRMED. REMANDED, WITH ORDER.
WHIPPLE, J., concurs.
NOTES
[1] The record reflects that defendant filed an earlier written motion to continue sentencing and the hearing on the post trial motions on the sole ground that he had not yet obtained a copy of the trial transcript. That motion was granted and the hearing was re-set for February 15, 1996.